UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ROBERT DAVYDOV, Derivatively on Behalf of ACADIA HEALTHCARE COMPANY, INC., | ) ) ) | Case No. |
| | ) | |
| Plaintiff, | ) ) | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF |
| v. | ) ) | SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, WASTE OF |
| JOEY A. JACOBS, WILLIAM BRENT TURNER, RONALD M. FINCHER, DAVID DUCKWORTH, REEVE B. WAUD, WILLIAM F. GRIECO, WADE D. MIQUELON, WILLIAM M. PETRIE, E. PEROT BISSELL, CHRISTOPHER R. GORDON, VICKY B. GREGG, and HARTLEY R. ROGERS, | ) ) ) ) ) ) ) ) ) | CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| | ) | |
| Defendants, | ) ) | |
| -and- | ) ) | |
| ACADIA HEALTHCARE COMPANY, INC., a Delaware corporation, | ) ) ) | |
| | ) | |
| Nominal Defendant. | ) ) | JURY DEMAND |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for

Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust

Enrichment. Plaintiff alleges the following on information and belief, except as to the

allegations specifically pertaining to plaintiff which are based on personal knowledge. This

complaint is also based on the investigation of plaintiff's counsel, which included, among other

things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC")

and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal

defendant Acadia Healthcare Company, Inc. ("Acadia" or the "Company") against certain of its

officers and directors for violations of securities laws, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs have resulted in billions of dollars in damages to Acadia's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Acadia to billions of dollars in potential liability for violations of federal law.

2.     Acadia is a healthcare services company that provides behavioral health and addiction services to patients in the United States, the United Kingdom ("U.K."), and Puerto Rico. The Company operates inpatient psychiatric hospitals, specialty treatment facilities, residential treatment centers, and outpatient clinics. Acadia operates more than 586 behavioral healthcare facilities with approximately 18,000 beds across these regions. The Company's U.K. operations generates a significant portion of the Company's revenues. In fiscal year 2016, for example, U.K publicly funded sources, including the National Health Service, Clinical Commissioning Groups, and local authorities in England, Scotland, and Wales, accounted for approximately 36% of the Company's revenues.

3.     In a bid to reduce costs and competition, in recent years, the Company has focused on an expansion of its healthcare services in the U.K. through a roll-up strategy, acquiring small companies in its same market. In December 2015, Acadia touted the acquisition of seventeen separate smaller healthcare groups and clinics in the U.K. The Company followed this with its biggest wager to date, a $2.2 billion cash and stock acquisition of Priory Group No. 1 Limited ("Priory"). Priory was the largest independent provider of mental health care facilities in the U.K. operating 324 facilities with approximately 7,100 beds. The Company completed the acquisition on February 16, 2016.

4. Acadia then sought to improve margins across its facilities by increasing beds while dramatically reducing staffing expenditures, the Company's single largest expense. Unfortunately, the Company's decision to prioritize profits over patients had dangerous repercussions. Reduced staffing and lower expenditures on patient care has led to repeated and systemic problems with both the quality of care being provided to patients and their safety while at Acadia's facilities. Indeed, patients at Acadia's facilities experienced alarming incidents of abuse, neglect, and even death. Federal inspectors repeatedly attributed the deficient patient care and dangerous conditions to Acadia's failure to provide adequate staffing.

5. Notwithstanding the serious issues plaguing the Company's facilities, in Acadia's Proxy Statements the Director Defendants (as defined herein), boasted that the Company "conduct[s] [its] business in compliance with applicable law including environmental, health and safety regulations." The Director Defendants also misleadingly assured investors that Acadia has "in place policies and practices concerning environmental, social and governance issues that underscore [its] commitment to being a good citizen." On these assurances, Acadia stockholders voted to reelect certain directors to the Company's Board of Directors (the "Board") and voted against a stockholder proposal to adopt a policy requiring the Company to prepare a sustainability report without adequate information necessary to make a reasonably informed decision.

6. The Company's fiduciaries also misled investors about Acadia's operations and financial prospects in the U.K. Despite negative trends in the U.K.'s healthcare services industry, including lower census and higher operating costs, the Individual Defendants (as defined herein) touted Acadia's U.K. business and boasted that the quality of its U.K. operations gave the Company a "competitive strength" that would drive future growth and profitability. According

to Acadia's public filings and press releases, "[f]avorable industry and legislative trends" would also facilitate the Company's growth.

7.    In direct contrast to these statements, however, the Company's U.K. operations were deteriorating as a result of higher agency costs and a tightening labor market. While the Individual Defendants were well aware of the negative trends in the U.K. healthcare market, these startling revelations did not emerge publicly until October 24, 2017, when the Company issued a press release announcing its disappointing financial results for the third quarter of 2017 and slashed its full year 2017 earnings guidance to be in the range of $2.23 to $2.25 per diluted share from its previously reaffirmed guidance of $2.42 to $2.47 per diluted share. Acadia attributed the dismal financial results and lowered guidance directly to "a lower census and higher operating costs" due to "seasonal softness" and a "tightening in the labor market" among other things.

8.    Not surprisingly, after the Company published the disappointing and unexpected financial results, shares of Acadia stock plummeted more than 26%, or $11.44 per share October 25, 2017, to close at $32.68 per share, compared to the previous trading day's closing of $44.12 per share, wiping out more than *$1 billion* in market capitalization in a single day.

9.    Making matters worse, between February 2017 and October 2017, while the Company's stock price was inflated due to the improper statements, Acadia repurchased approximately 71,636 shares of its stock from its own employees. This repurchase of inflated stock cost the Company over *$3.1 million*.

10.    Defendants, however, did not fare nearly as poorly as the Company. Certain of the Individual Defendants have unlawfully reaped over *$497 million* in illegal insider-trading proceeds of Company stock. In addition, during this time, certain of the Individual Defendants

collectively pocketed millions of dollars in executive compensation and directors' fees not justified by Acadia's actual performance while under their stewardship.

11.     Further, as a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Middle District of Tennessee on behalf of investors who purchased Acadia stock at artificially inflated prices (the "Securities Class Action"). The Securities Class Action seeks claims against Acadia and certain of the Individual Defendants in connection with the Company's improper statements concerning Acadia's operations and prospects, including causes of action under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

12.     Due to their direct involvement in the wrongdoing and substantial likelihood of liability its members face, any demand upon the Board to rectify the wrongdoing described herein would be a wasteful and useless act. Accordingly, plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. §1331 and section 27 of the Exchange Act, this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 10b-5 and 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367. Jurisdiction is also conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

14.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the

exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

15.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) Acadia maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Acadia, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

16.     Plaintiff Robert Davydov was a stockholder of Acadia at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Acadia stockholder.  Plaintiff is a citizen of California.

**Nominal Defendant**

17.     Nominal Defendant Acadia is a Delaware corporation with principal executive offices located at 6100 Tower Circle, Suite 1000, Franklin, Tennessee.  Accordingly, Acadia is a citizen of Delaware and Tennessee.  Acadia is a provider of behavioral healthcare services in a variety of settings, including inpatient psychiatric hospitals, specialty treatment facilities, residential treatment centers, and outpatient clinics.  As of September 30, 2018, Acadia operated 586 behavioral healthcare facilities with approximately 18,000 beds across the U.S., U.K., and Puerto Rico.  As of December 31, 2017, the Company had approximately 40,600 employees.

**Defendants**

18.     Defendant Joey A. Jacobs ("Jacobs") is an Acadia director and has been since February 2011. Defendant Jacobs was also Acadia's Chairman of the Board and Chief Executive Officer ("CEO") from February 2011 to December 2018. Defendant Jacobs is named as a defendant in the Securities Class Action that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Jacobs knowingly, recklessly, or with gross negligence: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to implement and maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Jacobs breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by his misleading statements and omissions. Defendant Jacobs also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. While in possession of material, nonpublic information concerning Acadia's true business health, defendant Jacobs sold 500,000 shares of his stock for $25.3 million in proceeds. Acadia paid defendant Jacobs the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2017 | $1,124,500 | $6,971,915 | $532,586 | $4,099 | $8,633,100 |

Defendant Jacobs is a citizen of Tennessee.

19.     Defendant William Brent Turner ("Turner") is Acadia's President and has been since April 2012.  Defendant Turner was also Acadia's Co-President from February 2011 to April 2012.  Defendant Turner is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act.  Defendant Turner knowingly, recklessly, or with gross negligence: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed.  Defendant Turner breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by the Company's misleading statements and omissions.  While in possession of material, nonpublic information concerning Acadia's true business health, defendant Turner sold 206,252 shares of his stock for $10.4 million in proceeds.  Acadia paid defendant Turner the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|-------------|----------------------------------------|------------------------|-------|
| 2017 | $624,000 | $1,403,990 | $193,237 | $2,946 | $2,224,173 |

Defendant Turner is a citizen of Tennessee.

20.     Defendant Ronald M. Fincher ("Fincher") is Acadia's Chief Operating Officer ("COO") and has been since February 2011.  Defendant Fincher knowingly, recklessly, or with gross negligence: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to

maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Fincher breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by the Company's misleading statements and omissions. Defendant Fincher also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. While in possession of material, nonpublic information concerning Acadia's true business health, defendant Fincher sold 121,483 shares of his stock for $5.9 million in proceeds. Acadia paid defendant Fincher the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2017 | $676,000 | $1,520,986 | $209,340 | $4,099 | $2,410,425 |

Defendant Fincher is a citizen of Tennessee.

21.     Defendant David Duckworth ("Duckworth") is Acadia's Chief Financial Officer and has been since July 2012. Defendant Duckworth was also Acadia's Chief Accounting Officer from January 2012 to July 2012 and Controller from April 2011 to January 2012. Defendant Duckworth is named as a defendant in the Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Duckworth knowingly, recklessly, or with gross negligence: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable,

meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Duckworth breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by the Company's misleading statements and omissions. Acadia paid defendant Duckworth the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2017 | $598,900 | $1,048,078 | $163,645 | $13,512 | $1,824,135 |

Defendant Duckworth is a citizen of Tennessee.

22. Defendant Reeve B. Waud ("Waud") is Acadia's Chairman of the Board and has been since December 2018 and a director and has been since December 2005. Defendant Waud was also Acadia's Lead Director from April 2012 to December 2018. Defendant Waud knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Waud breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by the Company's misleading statements and omissions. Defendant Waud also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. Acadia paid defendant Waud the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $132,000 | $159,985 | $291,985 |

Defendant Waud is a citizen of Illinois.

23.     Defendant William F. Grieco ("Grieco") is an Acadia director and has been since November 2011.  Defendant Grieco was also the Chair of Acadia's Audit Committee from at least April 2016 to at least March 2018.  Defendant Grieco knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed.  Defendant Grieco breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by the Company's misleading statements and omissions.  Defendant Grieco also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements.  Acadia paid defendant Grieco the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $127,000 | $159,985 | $286,985 |

Defendant Grieco is a citizen of Massachusetts.

24.     Defendant Wade D. Miquelon ("Miquelon") is an Acadia director and has been since January 2012.  Defendant Miquelon knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial

guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Miquelon breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by the Company's misleading statements and omissions. Defendant Miquelon also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxies. Acadia paid defendant Miquelon the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $114,500 | $159,985 | $274,485 |

Defendant Miquelon is a citizen of Ohio.

25. Defendant William M. Petrie ("Petrie") is an Acadia director and has been since October 2012. Defendant Petrie knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Petrie breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by the Company's misleading statements and omissions. Defendant Petrie

also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. Acadia paid defendant Petrie the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $109,500 | $159,985 | $269,485 |

Defendant Petrie is a citizen of Tennessee.

26. Defendant E. Perot Bissell ("Bissell") is an Acadia director and has been since April 2013. Defendant Bissell was also a member of Acadia's Audit Committee from at least April 2016 to at least March 2018. Defendant Bissell knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Bissell breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by the Company's misleading statements and omissions. Defendant Bissell also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxies. Acadia paid defendant Bissell the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $124,000 | $159,985 | $283,985 |

Defendant Bissell is a citizen of Connecticut.

27.     Defendant Christopher R. Gordon ("Gordon") is an Acadia director and has been since February 2015.  Defendant Gordon knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed.  Defendant Gordon breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by the Company's misleading statements and omissions.  Defendant Gordon also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements.  Acadia paid defendant Gordon the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $99,500 | $159,985 | $259,485 |

Defendant Gordon is a citizen of Massachusetts.

28.     Defendant Vicky B. Gregg ("Gregg") is an Acadia director and has been since May 2016.  Defendant Gregg knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and

appropriately addressed. Defendant Gregg breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by the Company's misleading statements and omissions. Defendant Gregg also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. Acadia paid defendant Gregg the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
| --- | --- | --- | --- |
| 2017 | $99,500 | $159,985 | $259,485 |

Defendant Gregg is a citizen of Tennessee.

29.     Defendant Hartley R. Rogers ("Rogers") was an Acadia director from April 2013 to May 2018. Defendant Rogers was also a member of Acadia's Audit Committee from at least April 2016 to May 2018. Defendant Rogers knowingly or recklessly: (i) caused or allowed Acadia to disseminate improper statements concerning its U.K. operations and the Company's financial guidance and growth prospects; (ii) failed to maintain adequate disclosure controls with respect to the Company's operations and financial guidance; and (iii) failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention and appropriately addressed. Defendant Rogers breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Acadia to repurchase its stock at prices he knew were artificially inflated by the Company's misleading statements and omissions. Defendant Rogers also negligently violated section 14(a) of the Exchange Act by causing Acadia to make misleading statements in its 2017 and 2018 Proxy Statements. Acadia paid defendant Rogers the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2017 | $102,000 | $159,985 | $261,985 |

Defendant Rogers is a citizen of New York.

30. The defendants identified in ¶¶18-21 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶22-29 are referred to herein as the "Director Defendants." The defendants identified in ¶¶23, 26, and 29 are referred to herein as the "Audit Committee Defendants." The defendants identified in ¶¶18-20 are referred to herein as the "Insider Selling Defendants." Collectively, the defendants identified in ¶¶18-29 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

31. By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owes Acadia and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and was and is required to use his utmost ability to control and manage Acadia in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Acadia and its stockholders, so as to benefit all stockholders equally, and not in furtherance of their personal interest or benefit.

32. Each director and officer of the Company owed, and owes, to Acadia, and its stockholders, the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Acadia, were able to, and did, directly and/or indirectly, exercise

control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Acadia, each of the Individual Defendants had knowledge of material, nonpublic information regarding the Company. In addition, as officers and/or directors of a publicly-held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's business practices, operations, financials, financial prospects, compliance policies, and internal controls, so that the market price of the Company's stock would be based on truthful and accurate information.

34. To discharge their duties, the officers and directors of Acadia were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Acadia were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b) ensure that the Company's facilities were safe and provided adequate care to patients;

(c) timely address and remedy known health and safety concerns;

(d) ensure that the Company complied with its legal obligations and requirements—including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in insider-trading and other deceptive conduct;

(e) conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide

the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(f)     remain informed as to how Acadia conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make a reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(g)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Duties Pursuant to the Company's Code of Conduct**

35.     The Individual Defendants, as officers and/or directors of Acadia, were also bound by the Company's Code of Conduct (the "Code"), which requires "each officer, employee and member of Acadia's Board of Directors . . . to comply with the law and to conduct Acadia's business in an ethical manner."   Among other things, the Code addressed the Individual Defendants' responsibilities with respect to the accuracy of the Company's public statements and reports to the SEC, stating:

> **Making False Reports to Government Agencies and Auditors**
>
> Federal law prohibits making any false, fictitious or fraudulent statement or report to any federal governmental agency.  Hiding or concealing any material fact that would make a statement or report misleading by its omission is also illegal.  Many states have enacted similar laws.  In addition, Acadia's internal and external auditors gather information that may be reported to federal or state agencies or disclosed in accordance with federal or state law.  Acadia requires that all information provided on its behalf to any governmental agency or by any employee to any internal or external auditor be true and complete (to the Company's best knowledge) in all material respects at the time provided.

36.     The Code also required that the Individual Defendants refrain from trading the Company's stock on the basis of confidential information.  In particular, the Code stated:

**Insider Trading**

Employees who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except the conduct of our business. All non-public information about the Company or any company with which we do business should be considered confidential information. To use non-public information for personal financial benefit or to "tip" others who might make an investment decision on the basis of this information is not only unethical but also illegal. In order to assist with compliance with laws against insider trading, the Company has adopted a specific policy governing employees' trading in securities of the Company. This policy has been distributed to every employee. If you have any questions, please consult the Company's Legal Department.

**Additional Duties of the Audit Committee Defendants**

37.     In addition to these duties, the Audit Committee Defendants owed specific duties to Acadia under the Audit Committee's Charter (the "Audit Charter"). According to the Audit Charter, the Audit Committee was responsible for assisting the Board in overseeing: (i) the quality and integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the Company's disclosure controls and procedures; and (iv) the Company's internal control over financial reporting. Among other things, the Audit Committee Charter obligated the Audit Committee Defendants to provide the Board with the results of the Audit Committee's monitoring and recommendations derived therefrom and provide to the Board such additional information and materials "necessary to make the Board aware of significant financial matters that require the attention of the Board." The Audit Committee is also charged with reviewing and discussing "with management the Company's major risk exposures with respect to the Company's accounting and financial reporting policies and procedures and the measures management has taken to monitor, measure and control such exposures and elicit recommendations for the improvement of the Company's risk assessment and mitigation procedures." To discharge these duties, the Audit Committee is empowered to "[i]nstitute special investigations with full access to all books, records, facilities and personnel of

the Company, when the Committee, in its sole discretion deems such an investigation is necessary."

**Breaches of Duties**

38.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Acadia, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

39.     The Individual Defendants breached their duty of loyalty and good faith by utterly failing to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls designed to ensure that critical health and safety issues were brought to the Board's attention which allowed the defendants to cause, or by themselves caused, the Company to operate unsafe facilities, placing Acadia's largest revenue source in jeopardy. The Individual Defendants also breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to make improper statements to the public and the Company's stockholders. These unlawful practices wasted the Company's assets, and caused Acadia to incur substantial damage.

40.     The Audit Committee members had a duty to review the Company's earnings press releases and regulatory filings. The Audit Committee Defendants breached their duty of loyalty and good faith by approving the improper statements detailed herein and failing to properly oversee Acadia's public statements and internal control functions.

41.     The Insider Selling Defendants further breached their duty of loyalty by selling Acadia stock on the basis of material, proprietary, and nonpublic information before that information was revealed to the Company's stockholders.

42.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Acadia, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' improper course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of federal securities laws.  As a result, Acadia has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Acadia, regarding the Company's financial prospects and the Individual Defendants' management of Acadia's operations; (ii) facilitate the Insider Selling Defendants' illicit sale of over $497.6 million worth of  their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Acadia and the profits, power, and prestige that the

Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

45.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

46.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

47.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

49.     Acadia provides healthcare services in the U.S., the U.K., and Puerto Rico.  The Company's business strategy is to acquire and develop behavioral healthcare facilities and providing patient care, expanding referral networks and marketing initiatives.  Publicly funded sources provide the vast majority of the Company's revenues.  Specifically, more than 50% of the Company's revenues are sourced from state governments under their respective Medicaid programs, and the federal government under the Medicare program.

50.     In recent years, the Company has focused on expanding its behavioral healthcare services in the U.K.  On February 16, 2016, the Company completed the acquisition of Priory for a total purchase price of approximately $2.2 billion, including cash consideration of $1.9 billion and the issuance of approximately four million shares of common stock to Priory stockholders.  Prior to Acadia's acquisition of Priory, Priory was an independent provider of behavioral healthcare services in the U.K., operating 324 facilities with approximately 7,100 beds at the time of acquisition.

51.     The Company's U.K. operations generate a significant portion of the Company's revenues.  In fiscal year 2017, for example, U.K. publicly funded sources, including the National Health Service, Clinical Commissioning Groups, and local authorities in England, Scotland, and Wales provided approximately 32% of the Company's revenues.  Accordingly, Acadia's U.K. operations and financial performance were a central focus for the Company.

### THE INDIVIDUAL DEFENDANTS ALLOW THE COMPANY TO OPERATE UNSAFE FACILITIES THAT CAUSE MULTIPLE DEATHS AND JEAPORDIZE ACADIA'S REVENUES FROM GOVERNMENT CONTRACTS

52.     In recent years, Acadia has employed a business strategy that prioritizes profits over patient safety and well-being.  As part of its strategy, Acadia sought to increase beds while dramatically reducing staffing expenditures, the Company's single largest expense.  This strategy

has had disastrous effects on Acadia's patient's health and safety, and placed the Company's revenues from government contracts in jeopardy.

53. On November 10, 2018, *The Daily Mail* published an article exposing the deplorable conditions at Acadia's facilities. The article revealed patient abuses at a number of the Company's facilities, explaining that "hundreds of people with autism and learning disabilities are being routinely abused in some facilities, confined in horrific seclusion cells, fed through hatches like animals, aggressively restrained and forcibly drugged."

54. A November 16, 2018, *Seeking Alpha* published an article titled "Acadia Healthcare: Very Scary Findings from a 14-Month Investigation," which further revealed the severity of the problems at Acadia's facilities and noted that the declining quality of care at Acadia's facilities has subjected the Company to a litany of lawsuits. The article pointed to issues at seven different facilities owned by Acadia. For example, two suicides occurred in a one-week period at Belmont Hospital in Philadelphia, Pennsylvania, and inspections by the Pennsylvania Department of Health revealed several deficiencies at the hospital. In particular, during an inspection in November 2016, the Pennsylvania Department of Health found that the hospital had failed to report six patient deaths that had occurred between December 2015 and November 2016, as required by 28 PA Section 709.34(c)(2). Other deficiencies found by the Pennsylvania Department of Health included insufficient and untrained staff.

55. Government investigations as well as lawsuits against the Company related to its Rolling Hills Hospital located in Ada, Oklahoma highlight similar conditions of neglect and failure to protect patients from abuse. According to a complaint filed in the District Court of Canadian County State of Oklahoma, Shannon Archer was admitted to Rolling Hills Hospital for alcoholism but suffered permanent brain damage when a patient violently grabbed her from

behind, pulled her hair, and smashed her head on the concrete floor. Due to the understaffed personnel, there was no supervision or security present at the time of the incident. Another lawsuit involving an unnamed minor alleges denial of critical emergency medical care, as well as multiple sexual assaults against children. Investigations by health inspectors from the Centers for Medicare and Medicaid Services confirmed deficiencies at the Rolling Hills Hospital. In particular, the investigations uncovered violations ranging from unqualified staff to infection control deficiencies, patient rights, and maintenance issues. The investigations found numerous instances where the hospital failed to ensure that patients received care in a safe setting.

56.     Likewise, the Company's failure to protect patients at its Timberline Knolls facility in Lemont, Illinois subjected Acadia to two lawsuits in 2017. One such lawsuit alleges wrongful death due to the neglect of patient Grace Cho. In the other lawsuit, Michael Jacksa, formerly a licensed therapist at Timberline Knolls, was charged with sexually assaulting a female patient during therapy sessions at Timberline Knolls.

57.     Acadia's Royal Park Hospital in Fort Myers, Florida and Harbor Oaks Hospital in New Baltimore, Michigan experienced similar issues resulting from the Company's failure to ensure the facility was adequately staffed. According to the *Seeking Alpha* article, the Royal Park Hospital's top physician resigned in 2017, citing the decline of the facility under Acadia's ownership. A report by the Centers for Medicare and Medicaid Services health inspectors shed more light on the deteriorating conditions at Royal Park Hospital. In particular, investigators found that the facility was "too short-staffed to properly supervise patients, ignoring their complaints, and had poor quality control procedures in place. Sexual assault against patients is alleged to have occurred as well." Likewise, a months-long investigation into Harbor Oaks Hospital by Detroit's WXYZ-TV Channel 7 revealed "a pattern of assaults on staff dating back

years, repeated allegations of physical and sexual abuse involving patients and cries for help that former employees say went ignored." Former employees stated that "We don't have enough staff… to deal with what we have" and asserted that "[Acadia] would rather have more money than [] make sure their staff was safe."

58. As pointed out in the *Seeking Alpha* article, the allegations of widespread abuse and neglect at Acadia's facilities are "eerily similar to the lawsuits from the Jacobs et al. era at Psychiatric Solutions," where defendant Jacobs served as CEO before it was sold to Universal Health Services. Similar to the current revelations about Acadia's poor quality of care, complaints filed against Psychiatric Solutions, Inc. ("PSI") and defendant Jacobs alleged that PSI suffered from systematic quality of care and patient safety problems which led to a failure by PSI to: (i) protect patients from sexual abuse; (ii) provide patient care in a safe environment; (iii) ensure its patients were adequately monitored; (iv) ensure its facilities were adequately staffed; and (v) ensure incidents were properly reported to state and federal authorities.

59. The *Seeking Alpha* article attributed the issues at Acadia's facilities directly to the Company's decision to cut costs. Specifically, as Acadia's U.K. operations deteriorated, the Company engaged in a cost-cutting strategy that dramatically reduced the quality of care at its facilities. The *Seeking Alpha* article observed that, "When a behavioral healthcare company stops growing its business, but revenue and profit margins continue to grow, that's a problem. This is only attained by reducing the quality of care." According to the article, the Company has "developed an industry-wide reputation for not providing quality care, cutting costs, and cannibalizing their own programs in order to raise profits. As a result, reputable clinicians are willing to refer to Acadia less and less."

60.    An extensive investigation conducted by Aurelius Value based on over 600 state and federal inspection reports as well as court records, media reports, lawsuits, and police records, confirmed the allegations contained in the *Seeking Alpha* report.  In particular, Aurelius Value's investigation found: (i) numerous patients, including children and teenagers, have died due to alleged negligence or malpractice at Acadia facilities; (ii) recurring reports of sexual abuse and physical assaults on vulnerable patients that have allegedly been perpetrated by Acadia employees or unmonitored patients; (iii) repeated instances of patient neglect or deficient care linked directly to staffing problems at Acadia facilities; and (iv) a pattern of whistleblower allegations made by former employees who say the Company retaliated against them after they reported fraud or misconduct.

61.    On December 3, 2018, *Seeking Alpha* published an article disclosing more abuses at Acadia's facilities. The article, titled "Acadia Healthcare: Former Patients, Staff, And U.K. Medial Outlet Corroborate Findings While Opioid Crisis Persists," contained accounts by a former patient, a former executive, and a facility employee.  The former executive explained that Acadia's facilities were plagued with deficiencies, and urged the author to investigate. According to the former executive, an investigation would reveal "compelling evidence of the poisonous impact of [Acadia's] culture."  The former patient reported that one of the major abuses she witnessed was the Company manipulating insurance benefit utilization.  In particular, the *Seeking Alpha* article stated:

**A Former Patient**

A confidential source and former patient of an Acadia facility who received care in 2017, and was discharged upon successfully completing care, stated;

*I felt a profound heartfelt gratitude for your article, published two days ago on November 16th on the business practices of Acadia Healthcare Company on Seeking Alpha.*

This person elaborated how she bore witness to patient abuse and a grossly understaffed facility. One of the major abuses she witnessed was the manipulation of insurance benefit utilization. She showed evidence that the facility is shuffling patients in and out of various care levels, so as to maximize the patients stay, and level of care in which insurers will reimburse various amounts per day.

In one case, this included prohibiting a patient exhibiting acute psychiatric symptoms from seeing an individually licensed physician, because it poses a risk of the unstable patient being taken to a higher level of care. Thus, another provider outside of Acadia's umbrella would benefit from that billed day. Under most insurance plans, patients are only given so many days in various levels of care per year, or over a lifetime, for that matter.

This patient lodged a complaint with state level regulators. I was provided a copy of the complaint and the response from that state. They stated that they "may have conducted interviews" and that the facility "may have issued a report that identified violations." However, the letter from regulators stated they were ultimately unable to substantiate claims.

62.     Another former Acadia employee corroborated Acadia's patient-shuffling practices and similarly urged the *Seeking Alpha* contributor to "keep exposing Acadia." The former employee reported that she was fired by the Company in 2017 "to simply boost their revenue" and went on to explain how Acadia's business model was to "create as much revenue as humanly possible." In recounting the former employee's report on Acadia's practices, the *Seeking Alpha* article stated:

**An Adolescent-Focused Facility Employee**

I interviewed another former employee of Acadia in person. This individual reached out via LinkedIn in a message that simply stated, "keep exposing Acadia, I was (fired) by them in 2017 to simply boost their revenue."

Public companies can, using adjusted EBITDA accounting statements, in theory, "add back" salaries from fired employees to boost revenue.

I asked several questions beginning with a request for their view of how Acadia leadership is affecting the individual facilities, they noted,

*As time goes on, the more control the leadership has over the facility, the independence of the facility started getting stripped away by penetrating their model of creating as much revenue as humanly possible.*

When asked what they meant by "stripping away" and "penetrating" the model of the facility?  They stated,

*We're already feeding clients peanut butter and jelly, and then we had to find a way to cut our food service plan. Then we needed to save bucks on living areas, and make them as barren as possible, and then we had to take on more patients, but couldn't add more clinicians.*

*...That's what's going on with each of their programs, they're trimming the fat off the turkey down to the bone.*

\*   \*   \*

This individual stated they spent the last several months since termination cleaning up their reputation.  When asked what he intended to do next, he said,

*I am going back to what needs to be done for clients, and providing quality care, and not rotting a family of their assets but giving them the second chance at life.*

The former staff member corroborated the apparent patient-shuffling to maximize insurance dollars and said this practice is not uncommon in the industry, especially since reimbursements dipped, starting, for the most part, in 2015.

63.     According to a recent *Seeking Alpha* article published on January 31, 2019, titled, "New Allegations of Elder/Veteran Abuse And Parliament's Autism Debate Could Further Jeopardize Top Line For Acadia Healthcare," "things don't seem to be improving for [Acadia]." The new *Seeking Alpha* article contained graphic photos originally published by the *Daily Oklahoman* and reported more allegations of elder abuse at Rolling Hills Hospital.  In particular, the *Seeking Alpha* article stated:

Things don't seem to be improving for the Franklin, TN-based healthcare provider; Acadia Healthcare Company, Inc. (ACHC).  The company has seen a mass exodus of value, about a third of its market cap, since my first report.

Gruesome photos are part of an article alleging elder/veteran abuse.  Finally, Parliament is closing in on finding the culprit in the autism center investigations in the U.K., an area in which Acadia thrives.  The latter comprises a tremendous

amount of the publicly funded revenue from the U.K, amounting to $756 million in Q1-Q3 2018 - their most significant revenue source, by far.

\* \* \*

On January 7th, Meg Wingerter of *The Daily Oklahoman* followed up on the patient abuse allegations at Rolling Hills Hospital in the rural Potontoc County, Oklahoma town of Ada (about an hour's drive southeast of Oklahoma City). This hospital was acquired by Acadia Healthcare in 2012. Wingerter reported the story of Marsha Ballou, the wife of Myron Ballou (70), a veteran of the United States armed forces and patient at Rolling Hills Hospital. According to Wingerter:

Myron Ballou, 70, was hospitalized in December 2017 after staff at the Oklahoma Veterans Center in Clinton observed changes in his behavior, Marsha (Ballou) said. Myron already had health problems and used a wheelchair, but he could stand for long enough to get into bed or onto the toilet, she said.

He hasn't been able to stand since he left Rolling Hills in January 2018, Marsha said. He suffered two fractured vertebrae, a dislocated shoulder, and a broken foot there, and hasn't recovered, she said.

This story, a geriatric twist to an already unconscionable saga of tragic breaks. Not only did Wingerter investigate the alleged abuse of Ballou but she also published some important photos of injuries that Acadia allegedly inflicted *upon* Ballou, while in their "care."

### THE INDIVIDUAL DEFENDANTS MADE OR ALLOWED ACADIA TO MAKE IMPROPER STATEMENTS IN BREACH OF THEIR FIDUCIARY DUTIES

64. On February 23, 2017, Acadia issued a press release announcing the Company's financial and operating results for the fourth quarter and fiscal year ended December 31, 2016 (the "FY 2016 Press Release"). For the fourth quarter, Acadia reported revenues of $702.9 million, compared to $495.3 million for the same period in the prior year, an increase of 41.9%, and net income of $41.8 million compared to $34.5 million for the fourth fiscal quarter of 2015, an increase of 21.1%. In terms of the Company's U.K. operations, defendant Jacobs claimed that the Company "produced very strong growth in revenue and adjusted EBITDA" driven by the acquisition of Priory. In the FY 2016 Press Release, defendant Jacobs stated:

The Priory acquisition drove the majority of our revenue growth for 2016, as we gained nearly 6,200 net additional beds in the U.K. due to the combined effect of

the acquisition and the subsequent facility sale. These beds represented a majority of the 71.7%, or over 7,100 bed, increase in total beds at the end of 2016 from the end of 2015. This increase includes 967 new beds added to existing or de novo facilities during the year, consisting of 827 beds to existing facilities and 140 beds to de novo facilities. During the fourth quarter, 279 new beds were added to existing facilities, and we expect to add more than 800 new beds during 2017, primarily to existing facilities.

. . . Same facility revenue in the U.K. grew 4.2%, on a 4.7% increase in patient days offset by a 0.5% decrease in revenue per patient day. Management believes that same facility results in the U.K. reflected disruption throughout the fourth quarter resulting from the focus, time and effort required to complete the divestiture in late November and to begin the integration of Priory's operations into Acadia.

65. The FY 2016 Press Release also included Acadia's financial guidance for fiscal year 2017 and the first fiscal quarter of 2017, stating:

- Revenue for 2017 in a range of $2.85 billion to $2.9 billion;

- Adjusted EBITDA for 2017 in a range of $625 million to $640 million;

- Adjusted earnings per diluted share for 2017 in a range $2.40 to $2.50; and

- Adjusted earnings per diluted share for the first quarter of 2017 in a range of $0.45 to $0.47.

66. On February 24, 2017, Acadia filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 Form 10-K") with the SEC, reaffirming the Company's statements about its financial results and guidance contained in the FY 2016 Press Release. The 2016 Form 10-K characterized Acadia as "the leading independent provider of mental health services in the U.K." and made a number of positive representations about the Company's U.K. operations. In particular, the 2016 Form 10-K discussed "favorable industry and legislative trends" and represented that the quality of the Company's U.K. operations gave it a "competitive strength" in the market. The 2016 Form 10-K stated:

The mental health hospitals market in the U.K. was estimated at £15.9 billion for 2014/2015. As a result of government budget constraints and an increased focus

- 31 -

on quality, the independent mental health hospitals market has witnessed significant expansion in the last decade, making it one of the fastest growing sectors in the U.K. healthcare industry. Demand for independent sector beds has grown significantly as a result of the National Health Service (the "NHS") reducing its bed capacity and increasing hospitalization rates. Independent sector demand is expected to further increase in light of additional bed closures and reduction in community capacity by the NHS.

*   *   *

The U.K. Department of Health recently identified priorities for essential change in mental health that include, among other things, funding providers based on the quality of their service rather than volume of patients, allocating funds to support specialized housing for people with mental health problems and adopting a new rating system and inspection process to improve the quality of care. Increasing political focus on the provision of mental health services in the U.K. and increasing support for the rights of mental health patients are expected to lead to further increases in the size of the mental health market in the U.K. In addition, rising demand for mental health services in the U.K. coupled with a constrained mental healthcare funding environment are increasing pressure to improve operational efficiency and refer patients to single provider programs with care pathways that more appropriately reflect each patient's specific mental health needs. As a result of these pressures and an increased focus on quality, the independent mental health market has witnessed significant expansion in the last decade, making it one of the fastest growing sectors in the U.K. healthcare industry.

67.    The 2016 Form 10-K was signed by defendants Jacobs, Duckworth Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, Rogers, and Waud. The 2016 Form 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Jacobs and Duckworth, certifying that the financial information included in the 2016 Form 10-K was accurate and disclosed any material changes in the Company's internal control over financial reporting.

68.    On April 25, 2017, Acadia issued a press release, announcing the Company's financial and operating results for the first fiscal quarter ended March 31, 2017 (the "April 25, 2017 Press Release"). For the first quarter, Acadia reported revenues of $679.2 million, compared to $616.8 million for the same period in the prior year, an increase of 10.1%, and net

income of $35 million, compared to $25.7 million for the first fiscal quarter of 2016, an increase of 36.1%. Net income from continuing operations attributable to Acadia stockholders per diluted share increased 29% to $0.40 for the first fiscal quarter 2017 from $0.31 for 2016 for the same quarter. In the April 25, 2017 Press Release, defendant Jacobs boasted that the Company's revenue growth was attributable to the acquisition of Priory and Acadia's U.K. operations, stating:

> Our revenue growth primarily resulted from the acquisition of Priory Group on February 16, 2016, which added approximately 6,200 beds, net of the divestiture, to our operations in the United Kingdom. In the trailing 12 months ended March 31, 2017, we also acquired nearly 240 beds through three transactions and added 719 beds to existing facilities and de novo facilities, 82 of which were added to existing facilities in the first quarter of 2017.

> The favorable impact of the growth in our beds in operation during the first quarter was partially offset by a reduction of approximately six percentage points in our revenue growth rate due to the post-Brexit decline in the exchange rate of the British Pound Sterling to the U.S. dollar, in addition to the impact of the first quarter of 2017 having one less day due to leap year in 2016.

> . . . Same facility revenues increased 2.6% for the U.K. facilities, with a 0.1% increase in patient days and a 2.4% increase in revenue per patient day. Total same facility EBITDA margin declined to 25.2% for the first quarter of 2017 from 25.6% for the first quarter of 2016. Acadia's consolidated adjusted EBITDA was $136.4 million for the first quarter of 2017, up 4.1% from $131.0 million for the first quarter of 2016.

69. The April 25, 2017 Press Release also reaffirmed the Company's previously announced 2017 financial guidance, stating:

- Revenue for 2017 in a range of $2.85 billion to $2.9 billion;

- Adjusted EBITDA for 2017 in a range of $625 million to $640 million; and

- Adjusted earnings per diluted share for 2017 in a range $2.40 to $2.50.

70. On April 26, 2017, Acadia filed its Quarterly Report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the first fiscal quarter ended March

- 33 -

31, 2017 (the "Q1 2017 Form 10-Q"). In the Q1 2017 Form 10-Q, Acadia reaffirmed the Company's statements about its financial results contained in the April 25, 2017 Press Release and continued to tout the Company's U.K. operational expansion, including the acquisition of Priory. The Q1 2017 Form 10-Q was signed by defendant Duckworth and contained signed SOX certifications by defendants Jacobs and Duckworth attesting to the accuracy of the statements contained in the financial report and the disclosure of any material changes in the Company's internal control over financial reporting.

71.     On June 9, 2017, Acadia filed a registration statement on Form S-3 and prospectus for a 'shelf' registration, i.e. a continuous offering process (the "2017 Form S-3"). The 2017 Form S-3 incorporated by reference the 2016 Form 10-K, the Q1 2017 Form 10-Q, and Current Reports on Forms 8-K filed May 10, 2017 and May 25, 2017, including the improper statements concerning the Company's financial condition and U.K. operations contained therein.

72.     On July 27, 2017, Acadia issued a press release reporting the Company's financial and operating results for the second fiscal quarter ended June 30, 2017 (the "July 27, 2017 Press Release"). For the second fiscal quarter, Acadia reported revenues of $715.9 million, compared to $756.5 million for the same period in the prior year, a decrease of 5.4%, and net income of $49.6 million, compared to $56.4 million for same period in the prior year. The Company reported net income from continuing operations attributable to Acadia stockholders of $0.57 per diluted share for the first fiscal quarter 2017, compared to $0.65 per diluted share for the same period in the prior quarter. In the July 27, 2017 Press Release, defendant Jacobs touted the Company's U.K. operations, emphasizing that "U.K. same facility revenues increased 4.0%, on growth of 2.8% and 1.1% in patient days and revenue per patient day, respectively." Defendant Jacobs further stated:

Our second quarter financial results were consistent with our expectations for the quarter and financial guidance for the year. We achieved improved same facility revenue performance, with growth of 6.5% for the quarter on an increase of 4.6% in patient days and 1.8% in revenue per patient day. We were especially pleased with our same facility revenue growth for our U.S. facilities, which increased 7.8% for the second quarter, on an increase of 6.0% in patient days and 1.7% in revenue per patient day, while U.K. same facility revenues increased 4.0%, on growth of 2.8% and 1.1% in patient days and revenue per patient day, respectively.

Our growth in same facility revenue for the second quarter resulted, in part, from the addition of 625 new beds to existing facilities in the 12 months ended June 30, 2017. During the second quarter, 91 new beds were added to existing facilities, and we expect to add approximately 800 new beds to existing facilities and three de novo facilities in 2017.

73. In the July 27, 2017 Press Release, the Company also disclosed that it had narrowed its previously reported financial guidance for fiscal year 2017. Specifically, the Company narrowed its Adjusted EBITDA guidance for 2017 to be in the range of $628 million to $635 million, from its previously announced range of $625 to $640, and narrowed its earnings guidance to be in the range of $2.42 to $2.47 per diluted share, from its previously announced range of $2.40 to $2.50 per diluted share.

74. On July 28, 2017, Acadia filed its Quarterly Report on Form 10-Q for the second fiscal quarter ended June 30, 2017 (the "Q2 2017 Form 10-Q"), reiterating the financial and operating results previously announced in the July 27, 2017 Press Release. The Company again touted its U.K. operational expansion, including the acquisition of Priory. The Q2 2017 Form 10-Q was signed by defendant Duckworth and contained signed SOX certifications by defendants Jacobs and Duckworth attesting to the accuracy of the statements contained in the financial report and the disclosure of any material changes in the Company's internal control over financial reporting.

75. On August 16, 2017, Acadia filed a prospectus supplement to the 2017 Form S-3 with the SEC, (the "2017 Prospectus Supplement"), pursuant to which certain Company insiders,

including defendants Jacobs, Turner, and Waud, and certain related entities, sold over 1.5 million shares of Acadia securities to Citigroup, Inc., which then sold these shares to the public. The offering priced Acadia shares at $50.69 per share and generated proceeds of over $76 million. The 2017 Prospectus Supplement incorporated by reference Acadia's 2016 Form 10-K, Q1 2017 Form 10-Q, and Q2 2017 Form 10-Q which contained improper statements concerning Acadia's financial condition and the Company's U.K. operations and growth prospects.

## REASONS THE STATEMENTS WERE IMPROPER

76. The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a) the Company's U.K. operations did not provide the "competitive strength" driving supposed growth and profitability;

(b) the Company failed to maintain adequate disclosure controls and procedures with respect to Acadia's operations; and

(c) as a result of the foregoing, the Company's officers' and directors' representations concerning Acadia's business, prospects, and financial condition were improper.

## THE INDIVIDUAL DEFENDANTS NEGLIGENTLY MADE MISLEADING STATEMENTS IN ACADIA'S PROXY STATEMENTS

77. Plaintiff's allegations with respect to the misleading statements in the Proxies are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

- 36 -

**The 2017 Proxy**

78.     On March 10, 2017, Acadia issued its Proxy Statement for the 2017 Annual Meeting of Stockholders, held on May 25, 2017 (the "2017 Proxy").   In the 2017 Proxy, defendants Bissell, Gregg, Rogers, Grieco, Jacobs, Waud, Petrie, Miquelon, and Gordon solicited stockholder votes to, among other things: (i) reelect defendants Petrie, Miquelon, and Gordon to the Board; and (ii) reject the stockholder proposal to require the Company prepare a sustainability report describing the Company's environmental, social and governance risks and opportunities, including patient safety.   Defendants Bissell, Gregg, Rogers, Grieco, Jacobs, Waud, Petrie, Miquelon, and Gordon negligently issued misleading statements with respect to each of these solicited votes.

### Misstatements in Support of Reelecting Defendants Petrie, Miquelon, and Gordon

79.     In support of defendants Bissell, Gregg, Rogers, Grieco, Jacobs, Waud, Petrie, Miquelon, and Gordon's bid to reelect defendants Petrie, Miquelon, and Gordon, these defendants highlighted their supposed successful oversight of the Company.   In particular, the 2017 Proxy assured stockholders that the Board and its Committees periodically assess the significant risks that Acadia faces, including the Company's major risk exposure with respect to its accounting and financial reporting policies and procedures.   The 2017 Proxy stated:

**Risk Oversight**

Our Board is responsible for overseeing our risk management process. The Board fulfills its responsibility by delegating many of these functions to its committees. Under its charter, the Audit Committee is responsible for meeting periodically with management to review our major financial risks and the steps management has taken to monitor and control such risks. The Audit Committee also oversees our financial reporting and internal controls and compliance programs.

The Board receives reports on risk management from our senior officers and from the Chairman of the Audit Committee. Also, our Executive Vice President, General Counsel and Secretary provides a summary of our outstanding litigation and any governmental investigations to our Board at each Board meeting.

Additionally, our Board regularly engages in discussions of the most significant risks that we are facing and how these risks are being managed. Our Board of Directors believes that the work undertaken by the Audit Committee, together with the oversight provided by the full Board of Directors, enables the Board to oversee our risk management function effectively.

80.     The 2017 Proxy thus assured stockholders that the Board was involved with Acadia's business strategy and actively monitored the Company's risks and compliance with applicable laws and regulations.  In reality, the Board was utterly failing in its oversight duties; allowing the Company to operate with inadequate internal controls, all while being informed of continuing operational issues and negative trends in the U.K.

81.     The 2017 Proxy harmed Acadia by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors. As a result of the misleading statements in the 2017 Proxy, Acadia's stockholders voted via an uninformed stockholder vote to reelect defendants Petrie, Miquelon, and Gordon to Acadia's Board.

**Misstatements in Opposition to Adopting a Policy to Require the Company Prepare a Sustainability Report**

82.     The 2017 Proxy also contained a stockholder proposal to adopt a policy to require the Company prepare a sustainability report describing the Company's environmental, social and governance risks and opportunities, including patient safety.  The Board recommended voting against this proposal claiming that the Company conducted its business in compliance with applicable laws, including all environmental, health and safety regulations governing the Company's operations, and that Acadia had in place policies and practices concerning environmental, social and governance issues that made the preparation of the report unnecessary. The Board recommended voting against this proposal for the following reasons:

*We conduct our business in compliance with applicable law including environmental, health and safety regulations,* and we work hard to be an exceptional employer, a good neighbor and a good citizen. *The Board of Directors believes that we currently have in place policies and practices concerning environmental, social and governance issues that underscore our commitment to being a good citizen and that make the preparation of a report of the type being requested in the proponent's resolution unnecessary.* After carefully considering this proposal again this year, we have determined that this stockholder proposal would not enhance stockholder value and we therefore recommend that you vote AGAINST this proposal.

*We maintain an active Compliance Program and Code of Conduct intended to promote ethics and integrity while completing the mission of helping patients at our facilities attain their full potential by delivering quality behavioral healthcare services in a caring, supportive and financially responsible environment.* As a responsible member of our community, Acadia believes it is important to maintain a safe environment. As required by our Code of Conduct, each employee is responsible for ensuring that all waste products, hazardous materials and other regulated items are stored, handled and disposed of in compliance with applicable laws and regulations. Employees are to immediately report any unsafe storage or improper disposal or release of a hazardous or toxic substance to their supervisor or department head and to the environmental compliance officer responsible for the facility.

While sustainability matters are important to our company, we believe that to prepare and issue a formal report of the type sought by the proponent, which it recommends be prepared with reference to the Global Reporting Initiative ("GRI") Sustainability Reporting Guidelines, would require significant time and expense and produce little added benefit to our stockholders. GRI is an international organization, based in Europe, with offices in the United States and several other countries around the globe. We believe the GRI Guidelines are primarily relevant to much larger corporations, especially those with significant operations in developing countries. While we strive to conduct our business in a socially responsible manner, we do not believe that a report of the type requested by the proponent would provide meaningful benefit to management or useful information to our stockholders.

Moreover, the Board of Directors has concluded that preparing the requested sustainability report would distract our personnel from their most critical mission – fulfilling our key business objectives.  Rather than adding staff, hiring consultants and spending the time and financial resources to develop a report that lacks an immediate and tangible return for our stockholders, we believe that our stockholders would benefit most directly by the continued focus of our financial, personnel and other resources on the core elements of our business strategy which include:

- creating a world-class organization that sets the standard of excellence in the treatment of specialty behavioral health and addiction disorders;

- creating behavioral health centers where people receive individualized and quality care that enables them to regain hope in a supportive, caring environment;

- offering an enviable internal culture and environment that encourages and supports both professional and personal growth that our employees are proud of; and

- developing partnerships with physicians, professionals, and payers within the communities we serve through the delivery of high quality specialty behavioral health services at affordable costs while always putting the patient first.

83.    The above statements misleadingly represented that the Company conducted its business in compliance with applicable laws, including all health and safety regulations governing the Company's operations, and that Acadia had in place policies and practices concerning social and governance issues that made the preparation of a sustainability report unnecessary.  In fact, however, as detailed herein, the Company's facilities operated under deplorable conditions, where patients were neglected and often subject to various incidents of misconduct, including sexual assault and wrongful death.

84.    As a result of these misleading statements, the Company's stockholders voted against adopting a policy to require the Company prepare a sustainability report without adequate information necessary to make a reasonably informed decision.

**The 2018 Proxy**

85.    On March 23, 2018, Acadia issued its Proxy Statement for the 2018 Annual Meeting of Stockholders, held on May 3, 2018 (the "2018 Proxy").  In the 2018 Proxy, defendants Bissell, Gregg, Rogers, Grieco, Jacobs, Waud, Petrie, Miquelon, and Gordon solicited stockholder votes to reelect defendants Bissell and Gregg to the Board, among other

things. Defendants Bissell, Gregg, Rogers, Grieco, Jacobs, Waud, Petrie, Miquelon, and Gordon negligently issued misleading statements with respect to each of these solicited votes.

86.    The 2018 Proxy stated the following in support of reelecting defendants Bissell and Gregg:

**Risk Oversight**

Our Board is responsible for overseeing our risk management process. The Board fulfills its responsibility by delegating many of these functions to its committees. Under its charter, the Audit Committee is responsible for meeting periodically with management to review our major financial risks and the steps management has taken to monitor and control such risks. The Audit Committee also oversees our financial reporting and internal controls and compliance programs.

The Board receives reports on risk management from our senior officers and from the Chairman of the Audit Committee. Also, our Executive Vice President, General Counsel and Secretary provides a summary of our outstanding litigation and any governmental investigations to our Board at each Board meeting. Additionally, our Board regularly engages in discussions of the most significant risks that we are facing and how these risks are being managed. Our Board of Directors believes that the work undertaken by the Audit Committee, together with the oversight provided by the full Board of Directors, enables the Board to oversee our risk management function effectively.

87.    Defendants' statements misleadingly suggested that the Board: (i) maintained oversight of the processes established to report and monitor systems for material risks applicable to the Company; and (ii) regularly reviewed enterprise-wide risk management, including internal controls and compliance with applicable laws and regulations. As detailed herein, the Board was utterly failing in its oversight duties; allowing the Company to operate with inadequate internal controls, all while being informed of continuing operational issues at several of the Company's facilities.

88.    The 2018 Proxy harmed Acadia by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors. As

a result of the misleading statements in the 2018 Proxy, Acadia's stockholders voted via an uninformed stockholder vote to reelect defendants Bissell and Gregg to Acadia's Board.

**THE TRUTH ABOUT ACADIA'S STRUGGLING U.K. OPERATIONS AND WIDESPREAD PATIENT ABUSES BEGIN TO EMERGE WHILE THE COMPANY'S FIDUCIARIES CONTINUE TO MISLEAD THE MARKET**

89.     Despite Acadia's routinely optimistic forecasts, on October 24, 2017, the Company issued a press release disclosing that its U.K. facilities were struggling (the "October 24, 2017 Press Release").  Citing a lower census, increased operating costs, "seasonal softness," and a tightening labor market, the Company announced that its U.K. facilities operating results fell significantly below the forecasts Acadia's fiduciaries had assured investors would be met. The press release also revealed that the Company had lowered its 2017 earnings guidance to be in the range of $2.23 to $2.25 per diluted share from its recently reaffirmed guidance of $2.42 to $2.47 per diluted share and reduced adjusted EBITDA from a range of $600 million to $605 million from a range of $628 million to $635 million.  In particular, the October 24, 2017 Press Release stated:

> The third quarter financial results for our operations in the United Kingdom reflected a lower census and higher operating costs than anticipated.  After experiencing expected seasonal softness in census for the month of August, the typical rebound in census in the month of September was significantly weaker than anticipated.  In addition, due to further tightening in the labor market primarily for nurses and other clinical staff, we incurred higher agency labor expense than planned.  Same facility revenue increased 3.8% for the quarter, with a 2.5% increase in patient days and a 1.2% increase in revenue per patient day. U.K. same facility EBITDA margin was 21.4% for the quarter compared with 22.6% for the third quarter last year.  Total facility EBITDA margin in the U.K. declined 170 basis points to 19.3% for the third quarter of 2017.

90.     Defendant Jacobs further discussed the challenges facing Acadia in the U.K during the Company's conference call with analysts and investors held the following day.  In discussing the tightening labor market in the U.K. defendant Jacobs stated:

The second issue is one we've discussed on these calls before, although it had more of an impact on our financial results this quarter compared to previous quarters. Due to the tightening labor market in the U.K. for nurses and other clinical staff, we saw higher labor expense than expected, which unfavorably impacted EPS by $0.05. We believe that uncertainty around Brexit is deterring healthcare workers from coming into the U.K. Therefore, we are having to rely more on agency labor to fill our open positions. We expect our costs to rise in August as our employees take vacations, but it was compounded as we had to fill vacant positions with agency labor. Labor costs continued to increase in September and we believe this trend will continue for the remainder of the year.

* * *

So there's a lot of things going on in the U.K. that we're working on around labor costs and revenue. And hopefully we'll start seeing that, but it will be a longer process in the U.K. than it is here in the U.S. But if we'll take one step at a time, hopefully by the end of the year we're in a much, much better position than we are today both on revenue and on managing the labor costs.

91.     The following day, on October 25, 2017, the Company held an earnings call with analysts and investors to discuss Acadia's third quarter 2017 financial and operating results. During the conference call, defendant Jacobs reiterated that the earnings shortfall in the U.K. was due to lower census and higher operating costs. Defendant Jacobs, however, reassured investors and analysts that these were short-term issues. In particular, defendant Jacobs stated:

Let me begin with the discussion of the results for our U.K. operations, which produced same facility revenue growth of 3.8% for the quarter and 2.4% total revenue growth. In addition, same facility EBITDA margin declined 120 basis points to 21.4%. In total, EBITDA margin fell 170 basis points to 19.3%. The results in the U.K. were significantly below our expectation.

We faced 2 unexpected issues in the U.K. that are primarily accountable for a $0.09 unfavorable impact on EPS. The first is that *the normal seasonality affecting census in the U.K. did not occur as expected for the third quarter.* The typical seasonal rebound in business in September was much weaker than historical experience led us to expect. Occupancy for the third quarter was just below 87% compared to our expectation of additional growth in occupancy of 89% to 90%. As a result, we believe the lower occupancy had a $0.04 impact to earnings per share. *Additionally, census in the U.K. still has not recovered thus far in October and this is reflected in our updated guidance.*

We continue to analyze and closely monitor the issue. ***We see no reason to believe this is anything other than a short-term issue***, but we have little visibility into the timing for a rebound to normal census level, which factors into our decision to reduce our 2017 financial guidance. Because we are confident in the long-term demand trends, we are continuing our new bed expansion as scheduled with 42 expected beds in the fourth quarter.

The second issue is one we've discussed on these calls before, although it had more of an impact on our financial results this quarter compared to previous quarters. ***Due to the tightening labor market in the U.K. for nurses and other clinical staff, we saw higher labor expense than expected, which unfavorably impacted EPS by $0.05.*** We believe that uncertainty around Brexit is deterring healthcare workers from coming into the U.K. Therefore, we are having to rely more on agency labor to all our open positions. We expect our costs to rise in August as our employees take vacations, but it was compounded as we had to fill vacant positions with agency labor. Labor costs continued to increase in September and we believe this trend will continue for the remainder of the year.

92. Not surprisingly, despite defendant Jacobs attempts to reassure the market these were short-term issues, when news of the Company's disappointing and unexpected financial results and significantly lowered financial guidance reached the market, Acadia's stock price fell $11.44 per share, or nearly 26%, to close at $32.68 per share on October 25, 2017, compared to the previous trading day's closing of $44.12 per share, erasing more than ***$1 billion*** in market capitalization in a single day.

93. On February 21, 2018, after the market closed, the Company issued a press release announcing its financial and operating results for the fourth quarter and fiscal year ended December 31, 2017. With respect to the Company's U.K. operations, the press release stated:

Same facility revenue for Acadia's U.K. operations increased 3.7% for the fourth quarter of 2017 compared with the fourth quarter of 2016, with a 1.5% increase in patient days and a 2.2% increase in revenue per patient day. U.K. same facility EBITDA margin was 21.1% for the fourth quarter compared with 22.3% for the fourth quarter of 2016. Mr. Jacobs added, "The fourth quarter results for our operations in the U.K. met our revised expectations. Our results still reflect a lower census than normal and continued pressure from higher agency labor expense, primarily for nurses and other clinical staff, due to tightening in the U.K. labor market."

- 44 -

94.     The following day, on February 22, 2018, the Company held an earnings conference call with analysts and investors to discuss Acadia's previously announced financial and operating results for the fourth quarter and fiscal year ended December 31, 2017.  During the conference call, defendant Jacobs touted the Company's fourth quarter results and made positive statements about the long-term outlook for Acadia's U.K. operations.  In particular, defendant Jacobs stated:

> We are pleased with the overall performance for the fourth quarter.  Our results met or exceeded our revised expectations.  Total same facility revenue for the fourth quarter of 2017 increased 5.6% as compared to the fourth quarter of 2016.  U.S. same facility revenue for the quarter increased 6.6% from the fourth quarter of 2016.  U.K. same facility revenue for the quarter increased 3.7% from the fourth quarter of 2016.
>
> *     *     *
>
> We have entered 2018 optimistic about our prospects for growth during the year.  We remain focused on the U.K. operations.  In the short term, we are working to mitigate the impact of a rollout to Italy, weak rebound in census in the latter month of 2017 and the increased cost of agency labor.  Longer term, we expect to manage through both of these issues by investing in initiatives to drive increased census, recruit additional nurses and clinical staff, improve our real-time labor management and negotiate appropriate reimbursement for the care we provide.
>
> We have implemented several initiatives to help manage our agency labor, including a new reporting tool.  Facilities are now required to track their agency hours on a daily basis.  With the help from these initiatives, we are starting to see improvement in our agency labor.  In January, agency expense as a percent of total labor declined to 11.4% from 12% in December.  We expect this improvement to continue throughout 2018.  As a percentage of revenue, total labor cost, including agency labor, are expected to decline from 65% in the fourth quarter of 2017 to less than 64% for 2018.
>
> We would also like to provide some guidelines for our same facility metrics in 2018.  We expect same facility revenue to grow in the mid-single digits.  Same facility EBITDA margins are expected the same or slightly up.  Despite some expected challenges in 2018, favorable dynamics related to demand and capacity, access and parity continue to support the growth potential of behavioral health care in the U.S. and the U.K. markets.  We believe Acadia is well positioned to leverage these dynamics to create further long-term growth in our earnings and shareholder value.

- 45 -

95.     On May 1, 2018, after the market closed, the Company issued a press release announcing its financial and operating results for the first quarter ended March 31, 2018.    The press release contained positive assertions about the Company's U.K. operations, and highlighted that: "**[**Acadia's] U.K. operations produced a rebound in same facility revenue for the quarter, both of which led to improved same facility margin.  This growth was supported by 57 beds added to existing facilities during the first quarter.  We also opened a new 64-bed facility, bringing total beds added for the quarter to 121.  We continue to plan the addition of more than 800 beds to existing and new facilities during 2018."

96.     On May 2, 2018, the Company held an earnings conference call with analysts and investors to discuss Acadia's previously announced financial and operating results for the first quarter ended March 31, 2018.  During the call, defendant Jacobs touted the Company's revenue growth in the U.K. and noted that "[s]ame facility EBITDA margin for [Acadia's] UK operations increased 30 basis points to 20.3%."  After Acadia's executives opening remarks, the Company opened the line up to questions from analysts.  During this segment of the earnings call, in response to RBC Capital Markets analyst Frank George Morgan's question about the timeframe for optimizing the Company's U.K. business, defendant Jacobs represented that Acadia's operations in the U.K. would continue to improve throughout the year.  In particular, the following exchange took place:

> **Frank George Morgan**: Got you. And just one final and I'll hop. It looks like this – maybe turnaround's not the right word, but definitely it looks like we're in the perhaps an inflection point in the UK, I'm just curious, would you agree with that assessment?  And really what kind of timeframe do you think it will take to get that business optimized back to where you would like it to be?  Thanks.

> **Joey A. Jacobs**: Okay.  I think, Frank, we have put – the team over there has put together two good quarters, and in the first quarter of this year, you continue to see the improvement.  As we've stated before, it's a process and we want to take another step forward in the second quarter.  It will take the remainder of the year,

I believe, to continue to work on blocking and tackling and getting the agency expense even lower. We're shooting to have total labor costs there under 64% by the end of the year. And so that's a good goal for us. And Trevor and the team over there are working very hard towards that.

So, we've taken a couple of small steps, there's more steps to do before we're really running. But we, senior management at the company, are pleased with what is happening in the UK and what our management team there is doing.

97. On July 31, 2018, the Company held an earnings conference call with analysts and investors to discuss Acadia's financial and operating results for the second quarter ended June 30, 2018. During the call, defendant Jacobs boasted that Acadia's "operations in the UK produced their best same facility growth in two years with an increase in same facility revenue of 5.6%, consisting of a 1.6% increase in patient days and a 3.9% increase in revenue per patient day." Defendant Jacobs, however, disclosed that U.K. "[s]ame facility EBITDA margin declined 110 basis points to 21.3% for the quarter," and stated: "We expect continued pressure on labor costs due to the shortage of available personnel and reliance on agency labor."

98. On November 5, 2018, after the market closed, the Company issued a press release announcing its financial and operating results for the third quarter ended September 30, 2018 and revealing that the Company had slashed its fully year 2017 earnings guidance to be in a range of $2.25 to $2.27 per diluted share from its previously announced guidance of $2.52 to $2.56. In the press release defendant Jacobs explained that Acadia's operating results in the U.K. had continued to deteriorate, and attributed the dismal financial results and lowered guidance to a lower census and increased operating expenses. In particular, the press release quoted defendant Jacobs as stating:

Our U.S. operations performed well with favorable trends in all key operating metrics. However, the third quarter financial results for our operations in the U.K. were affected by a lower census and higher operating expenses than expected. Our operating costs were significantly higher, primarily due to the ongoing nursing and clinical staff shortage and our dependence on higher cost

agency labor. Our census did not reach a sufficient level to absorb the higher wages and other operating costs, which adversely affected our margins for the third quarter.

99. The following day, on November 6, 2018, the Company held an earnings conference call with analysts and investors to discuss Acadia's previously announced financial and operating results for the third quarter of 2018. For the Company's U.K. operations, defendant Jacobs disclosed that "same-facility revenue was up 4.4%," however same-facility EBITDA margins declined 450 basis points to 16.9% for the quarter. Defendant Jacobs stated that Acadia's U.K. operations "were affected by a lower census and higher-than-expected operating expenses." Explaining the Company's dismal financial results in the U.K., defendant Jacobs further stated:

> Our operating costs were significantly higher, primarily due to the ongoing nursing and clinical staff shortage and our dependence on higher cost agency labor. The census in our existing healthcare business declined as we experienced a decrease in referrals from the NHS. Similar to industry trends, we continue to experience difficulty with recruiting nurses and clinical staff which requires us to utilize agency labor to fill those positions.

> Because our census did not reach its sufficient level to absorb the higher wages and other operating cost, our third quarter margins and earnings were adversely affected. We expect continued difficulties resulting from the nursing and clinical staff shortage for the foreseeable future.

100. During the question and answer portion of the conference call, in response to analysts' questions about Acadia's dismal operating results in the U.K. and revised financial guidance, defendant Jacobs stated that in the U.K., "the nurse shortage continues and actually grows. So we see that occurring continuing and going forward. So that's the reason for the lower in the guidance." Jefferies Financial Group analyst Brian Tanquilut ("Tanquilut") noted the similar challenges Acadia experienced in third quarter 2017 and questioned how the

Company's financial guidance was so far off. The following exchange took place between Tanquilut and defendant Jacobs:

> **Brian Gil Tanquilut**: ...we saw challenges in Q3 of last year and margins dropped to 21%. But the 450-basis-point drop, it just seemed really big and it seemed like the last few quarters you had your eye on the ball really closely on staffing. So, what blindsided you here in the quarter?

> **Joey A. Jacobs**: The census was softer than our expectation. And then, we had to use – our discussions with the UK operators, we had to use more nurse agency expense just on the base patient. And then, on the new beds that we opened up that we utilized more nurse agency expense there. And the census – it takes a little while for that census to ramp up, I think we'll be fine once it ramps up. It will cover the additional costs of the agency nurse. But those are the two things that hit us in the third quarter, was the softening of the census, but more importantly the nurse agency just was too great.

101. After news of the Company's disappointing and unexpected financial results and significantly lowered financial guidance reached the market, Acadia's stock price fell $5.75 per share, or nearly 13%, to close at $39 per share on November 6, 2018, erasing more than $507 million in market capitalization in only two trading days.

102. Only days later, on November 10, 2018, *The Daily Mail* published an article exposing Acadia's abuse of patients with autism and learning disabilities. According to the article, defendant Jacobs was one of the "Fat Cat" healthcare operators that is "creaming off hundreds of millions of pounds from NHS after muscling in on the cruel but lucrative trends in locking up people with autism and learning disabilities." The article further explained that "hundreds of people with autism and learning disabilities are being routinely abused in some facilities, confined in horrific seclusion cells, fed through hatches like animals, aggressively restrained and forcibly drugged."

103. Then, on November 16, 2018, *Seeking Alpha* published an article titled "Acadia Healthcare: Very Scary Findings From A 14-Month Investigation," further exposing the

deplorable conditions at Acadia's facilities, including those in the U.K.  The *Seeking Alpha*

article explained that as Acadia's U.K. operations deteriorated, the Company engaged in a cost-

cutting strategy that dramatically reduced the quality of care at its facilities.  The *Seeking Alpha*

article observed that, "When a behavioral healthcare company stops growing its business, but

revenue and profit margins continue to grow, that's a problem.  This is only attained by reducing

the quality of care."  Noting that the declining quality of care at Acadia's facilities has subjected

the Company to a litany of lawsuits, the article pointed to allegations against seven facilities

which were consistent with declining quality of care, stating:

> **<u>West Memphis, AR: Ascent Treatment & Outpatient Clinic</u>**. In June 2017,
> four employees were charged with manslaughter after a 5-year-old boy died.  The
> following month, the child's family filed a wrongful death suit against Ascent
> (owned by Acadia), the employees, and its corporate entities for $135 million.
> KARK reported that:
>
> *Ascent Children's Health Services CEO Dan Sullivan admits some employees*
> *didn't follow correct protocol and were fired.*
>
> **Philadelphia, PA, Belmont Hospital**. In a one-week period in 2017, two suicides
> occurred at the facility.  A lawsuit charges that the facility lacks sufficient and
> appropriately trained staff.  The State cited (Belmont-Combined-State-
> Inspections.pdf) the facility for lack of staff and lack of facilities that would
> prevent suicides, among other things.  When state inspectors visited in November
> of 2017, they declared a state of imminent danger.
>
> **Fort Myers, FL, Park Royal Hospital**.  Last year, the location's top physician
> since 2012 resigned, citing the decline of the facility under Acadia.  He said:
>
> *Ultimately, it became a matter of principle over passion, and the former was non-*
> *negotiable for me.*
>
> The hospital risk physician told regulators that she had:
>
> *... walked into a hot mess of an organization,*
>
> According to a report from the Centers for Medicare and Medicaid Services.
> Federal inspectors back them up, saying in a report to the Association of Health
> Care Journalists, that the facility is:

*... too short-staffed to properly supervise patients,* ignoring their complaints, and had poor quality control procedures in place. Sexual assault against patients is alleged to have occurred as well.

**New Baltimore, MI, Harbor Oaks Hospital**. The facility has been accused of rampant patient and staff abuse, and allegedly inflates staff to appropriate levels only when a visit from the Joint Commission is expected. A month-long news investigation by WXYZ of Detroit, MI, found:

*... a pattern of assaults on staff dating back years, repeated allegations of physical and sexual abuse involving patients.*

**Ada, OK, Rolling Hills Hospital**. An alleged cover-up attempt at the hospital by not reporting the deaths of patients to the facility's governing body. A lawsuit from one of the victims, Shannon Archer, highlights the conditions of neglect. This patient was admitted for alcoholism, but suffered permanent brain damage when, allegedly, a patient violently grabbed her from behind, grasping her hair and viciously slammed her head into the concrete floor. The other lawsuit, which involves an unnamed minor, alleges denial of critical emergency medical care, as well as multiple sexual assaults against children.

According to the Archer complaint, there was no supervision or security present at the time of the incident due to the understaffed personnel. I was made aware that the Oklahoma Department of Human Services apparently ordered the removal of all ODHS children from the facility.

Investigations by health inspectors from the Centers for Medicare and Medicaid Services revealed over 50 pages of violations ranging from unqualified staff to infection control deficiencies, patient rights, and maintenance issues. What we found most alarming were the instances of restraint and seclusion violations where adolescents were left unmonitored in seclusion rooms.

**Lemont, IL, Timberline Knolls**. According to the Acadia website, this facility is:

*located on 43 tranquil acres in the suburbs of Chicago. Residential treatment at Timberline Knolls includes a state-approved school for adolescents and 24-hour, 7 day per week medical care. Our intensive, holistic 6 treatment model results in a depth of recovery that is transformational for residents, and fulfilling for our staff.*

The women's substance abuse and eating disorder treatment facility is one for which Waud's company paid $90 million for in 2012. Two lawsuits have been filed against the facility this year. One complaint alleges wrongful death due to the neglect of patient Grace Cho. The other alleges sexual assault by Michael Jacksa, 40, a former counselor at the facility. Another suit, from 2015, alleges child neglect.

- 51 -

**Henderson, NV, Seven Hills Hospital**.  Multiple allegations of sexual assault of a patient exists, including McCardle v Seven Hills/Acadia, in which a patient exposes himself to a young woman.

104.    The *Seeking Alpha* article went on to observe that the sexual assault allegations were "eerily similar to the lawsuits from the Jacobs et al. era at Psychiatric Solutions," where defendant Jacobs was the CEO before that company was sold to Universal Health Services. Similar to the current revelations about Acadia's poor quality of care, complaints filed against PSI and defendant Jacobs alleged that PSI suffered from systematic quality of care and patient safety problems.  These deficiencies led to a failure by PSI to: (i) protect patients from sexual abuse; (ii) provide patient care in a safe environment; (iii) ensure its patients were adequately monitored; (iv) ensure its facilities were adequately staffed; and (v) ensure incidents were properly reported to state and federal authorities.

105.    The *Seeking Alpha* article also cited other concerns at Acadia, including a weak U.K. environment, severe seasonality in the summer months, and a damaged reputation as a result of the Company's failure to provide quality care, among other things.    In particular, the article stated:

> **Patient acceptance restrictions**. According to an anonymous industry expert trained in both business and medicine, "due to the number of suicides at some of their facilities, Acadia's ability to accept certain patients has been restricted by state-level governments."

> **Medicare/Medicaid contract risk**. In 2017, the majority of Acadia's US revenue came from Medicaid and Medicare contracts.

> **Inability to Expand.** At the same time that Acadia's debt burden is close to becoming unserviceable, it keeps saying it will continue expansion.

> *The company expects to add more than 800 beds to current and new facilities in 2018.*

> But, it has added a grand total of 152 beds (out of more than 17,000 total) – and that marginal growth has been off of deals struck in 2016.

**A weak UK environment**. 30% of Acadia's revenue comes from the UK, but problems exist, such as:

- **A weak exchange rate**. At the end of Q2, Acadia dropped its estimate for the exchange rate for Q3 from $1.35 to $1.30. It will likely have to drop it again for Q4.

- **Low census**. Despite Jacobs' reassurance of an analyst that it has no problem filling beds, Acadia has been unable to fill beds in the UK.

- **Shortages of staff**. Jacobs noted:

*The shortage of nursing staff in the UK is cause for alarm bells,*

... according to the Royal College of Nursing. In the last two years, the number of nurse vacancies has risen by 17%. More nurses are leaving the profession than joining, leaving Acadia without sufficient staff to care for its UK patients.

\*   \*   \*

**Seasonality**. Acadia struggles with severe seasonality in the summer months. A partial reason is that poor people are inclined to seek free shelter in a behavioral healthcare center when it is warm outside.

\*   \*   \*

**A damaged reputation**. Acadia gets most of its business from referrals. However, an expert in the industry says that Acadia has developed an industry-wide reputation for not providing quality care, cutting costs, and cannibalizing their own programs in order to raise profits. As a result, reputable clinicians are willing to refer to Acadia less and less.

106.    After highlighting that "Acadia's books do not look good," the *Seeking Alpha* article noted that "the leadership has, for the most part, cashed in." In discussing insider sales by defendants Waud and Jacobs, the article stated:

Reeve Waud is $638 million richer solely from the sales of individually owned stock, but still holds over 700,000 shares in various entities, according to Nasdaq. Waud also has a new house, widely known as Maine's "largest mansion."

\*   \*   \*

Joey Jacobs has extracted about $78 million from the company thus far (not including his compensation and bonus package). He recently acquired an ownership stake in the Nashville Predators, according to The Tennessean.

- 53 -

107. On December 3, 2018, *Seeking Alpha* published an article disclosing more abuses at Acadia's facilities and revealing the Company's business model of prioritizing profits over patients. The article, titled "Acadia Healthcare: Former Patients, Staff, And U.K. Medial Outlet Corroborate Findings While Opioid Crisis Persists," contained accounts by a former patient, a former executive, and a facility employee. The former patient reported that one of the major abuses she witnessed was the Company manipulating insurance benefit utilization. In particular, the *Seeking Alpha* article stated:

**A Former Patient**

A confidential source and former patient of an Acadia facility who received care in 2017, and was discharged upon successfully completing care, stated;

*I felt a profound heartfelt gratitude for your article, published two days ago on November 16th on the business practices of Acadia Healthcare Company on Seeking Alpha.*

This person elaborated how she bore witness to patient abuse and a grossly understaffed facility. One of the major abuses she witnessed was the manipulation of insurance benefit utilization. She showed evidence that the facility is shuffling patients in and out of various care levels, so as to maximize the patients stay, and level of care in which insurers will reimburse various amounts per day.

In one case, this included prohibiting a patient exhibiting acute psychiatric symptoms from seeing an individually licensed physician, because it poses a risk of the unstable patient being taken to a higher level of care. Thus, another provider outside of Acadia's umbrella would benefit from that billed day. Under most insurance plans, patients are only given so many days in various levels of care per year, or over a lifetime, for that matter.

This patient lodged a complaint with state level regulators. I was provided a copy of the complaint and the response from that state. They stated that they "may have conducted interviews" and that the facility "may have issued a report that identified violations." However, the letter from regulators stated they were ultimately unable to substantiate claims.

108. The *Seeking Alpha* article also contained an account by a former executive who explained that Acadia's facilities were plagued with deficiencies, and urged the author to

investigate.  According to the former executive, an investigation would reveal "compelling evidence of the poisonous impact of [Acadia's] culture."  The former executive also pointed out that two lawsuits were filed in 2018 against Timberline Knolls, an Acadia Residential Treatment Center located outside of Chicago.  One such lawsuit related to wrongful death due to the neglect of patient Grace Cho, and the other alleged sexual assault by a former counselor at the facility.

109.    Another former Acadia employee corroborated Acadia's patient-shuffling practices and similarly urged the *Seeking Alpha* contributor to "keep exposing Acadia."  The former employee reported that she was fired by the Company in 2017 "to simply boost their revenue" and went on to explain how Acadia's business model was to "create as much revenue as humanly possible."  In recounting the former employee's report on Acadia's practices, the *Seeking Alpha* article stated:

> **An Adolescent-Focused Facility Employee**
>
> I interviewed another former employee of Acadia in person. This individual reached out via LinkedIn in a message that simply stated, "keep exposing Acadia, I was (fired) by them in 2017 to simply boost their revenue."
>
> Public companies can, using adjusted EBITDA accounting statements, in theory, "add back" salaries from fired employees to boost revenue.
>
> I asked several questions beginning with a request for their view of how Acadia leadership is affecting the individual facilities, they noted,
>
> *As time goes on, the more control the leadership has over the facility, the independence of the facility started getting stripped away by penetrating their model of creating as much revenue as humanly possible.*
>
> When asked what they meant by "stripping away" and "penetrating" the model of the facility? They stated,
>
> *We're already feeding clients peanut butter and jelly, and then we had to find a way to cut our food service plan. Then we needed to save bucks on living areas, and make them as barren as possible, and then we had to take on more patients, but couldn't add more clinicians.*

*...That's what's going on with each of their programs, they're trimming the fat off the turkey down to the bone.*

\*     \*     \*

This individual stated they spent the last several months since termination cleaning up their reputation. When asked what he intended to do next, he said,

*I am going back to what needs to be done for clients, and providing quality care, and not rotting a family of their assets but giving them the second chance at life.*

The former staff member corroborated the apparent patient-shuffling to maximize insurance dollars and said this practice is not uncommon in the industry, especially since reimbursements dipped, starting, for the most part, in 2015.

110.     The deplorable conditions at Acadia's U.K. facilities were further revealed on December 13, 2018, when *Seeking Alpha* published an article titled "Kids As 'Cash Cows': Abuses At U.K. Mental Health Centers, Including Acadia's." The article described abuses at mental health institutions in the U.K., including Acadia's, such as wrongful death, sexual assault, and neglect of patients, and went on to note that these issues put Acadia's revenues from its U.K. operations in serious jeopardy. In particular, the article stated:

- The UK's House of Commons held hearings Wednesday on the deplorable treatment and involuntary commitment of children with mental health disorders -- some at facilities operated by Acadia Healthcare.

- Families gave shocking testimony about children being locked away, isolated and fed through holes -- stunning lawmakers and stirring calls for immediate reform.

- Acadia reported $756 million in 2018 Q1-Q3 revenue from its UK facilities (which are government-funded) -- a massive portion of their outward financial health that could soon be threatened.

\*     \*     \*

In a stunning hearing here that left onlookers in tears and lawmakers aghast, families of children with autism and other mental health disorders testified about their kids' deplorable treatment at inpatient facilities funded by the UK government. One girl was being fed through a six-inch square hole in a wall.

Others were physically and psychologically abused, while one father described his daughter and other patients like her as "cash cows."

But this was not just an across-the-pond story: *Some* of those facilities are run by Acadia Healthcare Company (Nasdaq: ACHC), which generated $756 million of revenue from its UK operations in the first three quarters of this year. As lawmakers demanded that the nation's government-funded health care system better oversee its massive spending in the mental-health sector, it was clear that Acadia's vital overseas income stream could soon be threatened. It is unclear whether any of the few individuals providing testimony were discussing Acadia owned centers, however, Ian Birrell specifically named Joey Jacobs and Acadia as owners of facilities allegedly performing this gruesome practice.

111.    Then, on January 31, 2019, *Seeking Alpha* published an article titled, "New Allegations of Elder/Veteran Abuse And Parliament's Autism Debate Could Further Jeopardize Top Line For Acadia Healthcare."   The article continued the discussion about Acadia's operations in the U.K., noting that, "Parliament is closing in on finding the culprit in the autism center investigations in the U.K., an area which Acadia thrives," and went on to explain how Parliament's findings could jeopardize Acadia's financial position even further.  In particular, the *Seeking Alpha* article stated:

Things don't seem to be improving for the Franklin, TN-based healthcare provider; Acadia Healthcare Company, Inc. (ACHC). The company has seen a mass exodus of value, about a third of its market cap, since my first report.

Gruesome photos are part of an article alleging elder/veteran abuse. Finally, Parliament is closing in on finding the culprit in the autism center investigations in the U.K., an area in which Acadia thrives. The latter comprises a tremendous amount of the publicly funded revenue from the U.K, amounting to $756 million in Q1-Q3 2018 - their most significant revenue source, by far.

*    *    *

**Public Money Up in The Air**

The most extended government shutdown in history is undoubtedly going to weigh on providers, at least regarding the timeliness of entitlement reimbursements.   Providers see a big dip in commercial insurer revenue and increasingly high co-pays and deductibles that force patients to pay out-of-pocket earlier in the year.   With higher out-of-pocket costs, the Q1 and Q2 Medicare/Medicaid payments are critical for these predominantly high-debt firms to meet rising interest expenses.  Of course, for mental health; reimbursements get

double-scrutiny thanks to fraud and broadly defined parameters of treatment. U.K. and U.S. government health contracts make up the bulk of the money paid to Acadia Healthcare. Presently, over 70% of the company's top-line is paid to Acadia by the British and American taxpayers.

We reported on December 13th after attending the U.K.'s Parliamentary Joint-Committee on Human Rights hearings on conditions in autism treatment centers.

Since then, heated and passionate arguments have been presented by lawmakers. The Right Honorable Norman Lamb, a member of Parliament (MP), is the Liberal Democrat Spokesperson for Health, and according to the same Express article, recently said:

Keeping these people locked up in cells is an intolerable, fundamental breach of human rights. Many are also forcibly given anti-psychotic drugs which dull their senses and make them sleep for long periods.

Undoubtedly, the unfortunate issue of human rights violations is in the hands of Parliament. The Joint Committee requested submissions for information (evidence) of these instances and the submission period ends on February 8, 2019.

These factors jeopardize Acadia's financial position further. One area in which this is displayed is the ability for ACHC to cover interest expenses.

As we previously reported, Acadia's interest-coverage ratio (at 2.43 after 2018 Q3) is alarmingly low (below 3 means red alert). However, it's unclear as to what the actual metric is. Last month, a nurse in the finance office at a subsidiary stated in an interview early this month that Acadia's top-line revenues are overstated and allowances for bad debts are understated.

### INSIDER SALES BY DEFENDANTS WAUD, GORDON, JACOBS, TURNER, FINCHER, AND GRIECO

112. Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Acadia's material, non-public information to sell their personal holdings while the Company's stock was artificially inflated. As officers and directors of Acadia, the Insider Selling Defendants were privy to material, non-public information about Acadia's true business health.

113. While in possession of this knowledge, defendant Waud sold 6,123,660 shares of his personally held Acadia stock for proceeds of *$278.3 million*. Defendant Waud's sales were timed to maximize profit from Acadia's then artificially inflated stock price. In fact, significant

portions of these sales—2.2 million shares—occurred in July and August 2017, when the Company's stock price averaged around $50 per share as a result of Acadia's misleading representations, and only shortly before Acadia's stock price plummeted in October 2017. Defendant Waud's sales are also suspicious given that his stock sales represented 83.57% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 7,323,624 |
| Shares Sold During Sales Period ("SP") | 6,123,660 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 7,327,376 |
| Shares Remaining SP | 1,203,716 |
| **Total Proceeds from Sales** | **$278,339,904.03** |
| **% of Total Ownership Sold During SP** | **83.57%** |

114.    While in possession of this knowledge, defendant Gordon sold 3,452,202 shares of his personally held Acadia stock for proceeds of *$177.3 million*.  Defendant Gordon's sales were timed to maximize profit from Acadia's then artificially inflated stock price.  In fact, all of these sales—3.2 million shares—occurred in July and August 2017, when the Company's stock price averaged around $50 per share as a result of Acadia's misleading representations, and only shortly before Acadia's stock price plummeted in October 2017.  Defendant Gordon's sales are suspicious given that his stock sales represented 99.94% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 3,453,813 |
| Shares Sold During SP | 3,452,202 |
| Shares Disposed (Other) During SP | 0 |
| Total Shares Held During SP | 3,454,223 |
| Shares Remaining SP | 2,021 |
| **Total Proceeds from Sales** | **$177,347,732.82** |
| **% of Total Ownership Sold During SP** | **99.94%** |

Defendant Gordon's sales were dramatically out of line with his prior trading practices. Indeed, prior to July 31, 2017, defendant Gordon had not sold a single share of Acadia stock in over a year.

115. While in possession of this knowledge, defendant Jacobs sold 500,000 shares of his personally held Acadia stock for proceeds of *$25.3 million*. Defendant Jacobs' sales were timed to maximize profit from Acadia's then artificially inflated stock price. In fact, all of these sales—500,000 shares—occurred in July and August 2017, when the Company's stock price averaged around $50 per share as a result of Acadia's misleading representations, and only shortly before Acadia's stock price plummeted in October 2017. Defendant Jacobs' sales are suspicious given that his stock sales represented 51.34% of his holdings as demonstrated by the table below:

| Total Shares Before Sales | 899,657 |
|---|---|
| Shares Sold During SP | 500,000 |
| Shares Disposed (Other) During SP | 4,758 |
| Total Shares Held During SP | 973,903 |
| Shares Remaining SP | 469,145 |
| **Total Proceeds from Sales** | **$25,345,000.00** |
| **% of Total Ownership Sold During SP** | **51.34%** |

Defendant Jacobs' sales were dramatically out of line with his prior trading practices. Indeed, prior to August 22, 2017, defendant Jacobs had not sold a single share of Acadia stock in over a year.

116. While in possession of this knowledge, defendant Turner sold 206,252 shares of his personally held Acadia stock for proceeds of *$10.4 million*. Defendant Turner's sales were timed to maximize profit from Acadia's then artificially inflated stock price. In fact, a substantial portion of these sales—206,252 shares—occurred in August 2017, when the Company's stock price averaged more than $50 per share as a result of Acadia's misleading representations, and

only shortly before Acadia's stock price plummeted in October 2017. Defendant Turner's sales are suspicious given that his stock sales represented 71.43% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 268,187 |
| Shares Sold During SP | 206,252 |
| Shares Disposed (Other) During SP | 1,397 |
| Total Shares Held During SP | 288,755 |
| Shares Remaining SP | 81,106 |
| **Total Proceeds from Sales** | **$10,454,913.88** |
| **% of Total Ownership Sold During SP** | **71.43%** |

Defendant Turner's sales were dramatically out of line with his prior trading practices. Indeed, prior to August 22, 2017, defendant Turner had not sold a single share of Acadia stock in over a year.

117.     While in possession of this knowledge, defendant Fincher sold 121,483 shares of his personally held Acadia stock for proceeds of *$5.9 million*. Defendant Fincher's sales were timed to maximize profit from Acadia's then artificially inflated stock price. In fact, a substantial portion of these sales—80,000 shares—occurred in August 2017, when the Company's stock price averaged around $50 per share as a result of Acadia's misleading representations, and only shortly before Acadia's stock price plummeted in October 2017. Defendant Fincher's sales are suspicious given that his stock sales represented 51.02% of his holdings as demonstrated by the table below:

| | |
|---|---|
| Total Shares Before Sales | 191,812 |
| Shares Sold During SP | 121,483 |
| Shares Disposed (Other) During SP | 46,421 |
| Total Shares Held During SP | 238,110 |
| Shares Remaining SP | 70,206 |
| **Total Proceeds from Sales** | **$5,919,446.02** |
| **% of Total Ownership Sold During SP** | **51.02%** |

118.     While in possession of this knowledge, defendant Grieco sold 6,000 shares of his personally held Acadia stock for proceeds of *$281,463*.  Defendant Grieco's sales were timed to maximize profit from Acadia's then artificially inflated stock price.  In fact, a substantial portion of these sales—2,000 shares—occurred on August 11, 2017, when the Company's stock price averaged more than $51 per share as a result of Acadia's misleading representations, and only shortly before Acadia's stock price plummeted in October 2017.

119.     The Insider Selling Defendants' sales were timed to maximize profit from the Individual Defendants' overall scheme to artificially inflate Acadia's stock price.  Following the misleading statements made on February 23, 2017, after the market closed, the Company's stock price rose from a low of $43.24 per share that day to as high as $51.84 per share on July 24, 2017, representing a 19.8% increase.  Notably, in the period between February 23, 2017 and October 24, 2017, when the Company's stock was artificially inflated by Acadia's fiduciaries improper statements, the Insider Selling Defendants sold over $497 million worth of their personally held stock.

120.     In sum, defendants Waud, Gordon, Jacobs, Turner, Fincher, and Grieco sold over *$497.6 million* worth of stock was sold at artificially inflated prices as detailed by the table below:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **WAUD** | 3/15/2017 | 2,973,773 | $41.06 | $122,103,119.38 |
| **Current** | 3/15/2017 | 51,118 | $41.06 | $2,098,905.08 |
| **Chairman/Former** | 6/9/2017 | 50,000 | $45.09 | $2,254,350.00 |
| **Lead Director** | 6/14/2017 | 724,694 | $45.53 | $32,995,317.82 |
| | 6/22/2017 | 50,000 | $47.51 | $2,375,600.00 |
| | 7/5/2017 | 50,000 | $50.04 | $2,502,150.00 |
| | 7/28/2017 | 34,600 | $53.13 | $1,838,298.00 |
| | 7/28/2017 | 15,400 | $53.63 | $825,902.00 |
| | 7/31/2017 | 1,190,000 | $51.65 | $61,463,500.00 |
| | 8/22/2017 | 984,075 | $50.69 | $49,882,761.75 |

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| | | **6,123,660** | **Total (Sales)** | **$278,339,904.03** |
| | | | | |
| **GORDON** | 7/31/2017 | 2,453,764 | $51.65 | $126,736,910.60 |
| **Current Director** | 8/22/2017 | 998,438 | $50.69 | $50,610,822.22 |
| | | **3,452,202** | **Total (Sales)** | **$177,347,732.82** |
| | | | | |
| **JACOBS** | 2/24/2017 | 1,413 | $43.24 | $61,098.12 |
| **Current** | 2/27/2017 | 1,374 | $44.94 | $61,747.56 |
| **Director/Former** | 3/29/2017 | 1,971 | $43.59 | $85,915.89 |
| **Chairman & CEO** | 8/22/2017 | 200,000 | $50.69 | $10,138,000.00 |
| | 8/22/2017 | 300,000 | $50.69 | $15,207,000.00 |
| | | **500,000** | **Total (Sales)** | **$25,345,000.00** |
| | | | | |
| **TURNER** | 2/24/2017 | 258 | $43.24 | $11,155.92 |
| **Current President** | 2/27/2017 | 353 | $44.94 | $15,863.82 |
| | 3/29/2017 | 786 | $43.59 | $34,261.74 |
| | 8/22/2017 | 206,252 | $50.69 | $10,454,913.88 |
| | | **206,252** | **Total (Sales)** | **$10,454,913.88** |
| | | | | |
| **FINCHER** | 2/24/2017 | 281 | $43.24 | $12,150.44 |
| **Current COO** | 2/27/2017 | 362 | $44.94 | $16,268.28 |
| | 3/29/2017 | 778 | $43.59 | $33,913.02 |
| | 5/1/2017 | 45,000 | $43.96 | $1,978,200.00 |
| | 5/2/2017 | 41,483 | $44.94 | $1,864,246.02 |
| | 8/22/2017 | 50,000 | $50.69 | $2,534,500.00 |
| | 8/22/2017 | 30,000 | $50.69 | $1,520,700.00 |
| | | **121,483** | **Total (Sales)** | **$5,919,446.02** |
| | | | | |
| **GRIECO** | 3/2/2017 | 1,000 | $44.64 | $44,640.00 |
| **Current Director** | 3/10/2017 | 1,000 | $42.56 | $42,560.00 |
| | 6/16/2017 | 1,000 | $45.44 | $45,436.40 |
| | 6/16/2017 | 1,000 | $45.41 | $45,406.80 |
| | 8/11/2017 | 1,000 | $51.68 | $51,675.00 |
| | 8/11/2017 | 1,000 | $51.75 | $51,745.00 |
| | | **6,000** | **Total (Sales)** | **$281,463.20** |
| | | | | |
| | | **10,409,597** | **Total (Sales)** | **$497,688,459.95** |

## THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO REPURCHASE MILLIONS OF DOLLARS' WORTH OF ITS OWN STOCK AT INFLATED PRICES

121.     In breach of their fiduciary duties to Acadia, and in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, defendants issued, and caused the Company to issue, the above misleading statements.  These statements artificially inflated the price of Acadia's stock.

122.     When an employee's restricted stock units vest, the employee owes taxes on those stock units.  Further, when an employee exercises a stock option, there are costs associated with the exercise of the option, such as paying the exercise price.  Instead of incurring these costs, Acadia allows employees to relinquish their stock.  The amount of stock that the employee relinquishes is based on Acadia's stock price.  The greater the stock price, the less stock the employee has to relinquish.  In the case of relinquishing the stock for tax purposes, Acadia has to then pay the actual taxes owed to the respective taxing authorities.  Acadia pays that amount in cash, not stock.  The amount Acadia pays is based on the value at the time of the relinquishment of the stock, therefore, even if its stock price goes down, Acadia is on the hook for the cash payment to the government.  As a result, Acadia is damaged in two ways when its stock price is inflated and an employee relinquishes stock to it.  First, the Company receives less stock than it should.  Second, the Company pays more taxes than it should and does not receive stock worth that corresponding amount.

123.     The expense to the Company from this program is substantial.  The Company accounts for the relinquishment of the stock as an expense in its financial statements, categorizing it as a repurchase of stock.

124.     In particular, the Company repurchased the following amount of stock:

| Period | Repurchased Shares | Average Price Per Share | Weighted Average Calculation | Approximate Aggregate Cost |
|--------|--------------------|-----------------------|------------------------------|----------------------------|
| Feb-17 | 58,081 | $42.43 | $34.40 | $2,464,377 |
| Mar-17 | 57,138 | $42.27 | $33.72 | $2,415,223 |
| May-17 | 2,287 | $43.45 | $1.39 | $99,370 |
| Jun-17 | 4,597 | $46.22 | $2.97 | $212,473 |
| Jul-17 | 4,400 | $50.08 | $3.08 | $220,352 |
| Aug-17 | 3,016 | $50.29 | $2.12 | $151,675 |
| Sep-17 | 198 | $47.28 | $0.13 | $9,361 |
| Oct-17 | 590 | $33.25 | $0.27 | $19,618 |
| | **71,636** | | **$43.39** | **$3,108,455** |

125. Notably, the same Insider Selling Defendants mentioned above accounted for a substantial amount of the repurchased stock detailed in the table above.

## DAMAGES TO ACADIA

126. As a result of the Individual Defendants' improprieties, Acadia disseminated improper public statements concerning the Company's operations and financial prospects in the U.K. These improper statements have devastated Acadia's credibility as reflected by the Company's more than *$1 billion*, or 25.9%, market capitalization loss when the truth about Acadia's deteriorating operations in the U.K. emerged.

127. Acadia's scheme to conceal material, adverse information from the investing public and failure to provide quality care also damaged its reputation within the business community and in the capital markets. As noted in the November 16, 2018 *Seeking Alpha* article referenced herein, Acadia generates most of its business from referrals. However, Acadia has "developed an industry-wide reputation for not providing quality care, cutting costs, and cannibalizing their own programs in order to raise profits. As a result, reputable clinicians are willing to refer to Acadia less and less." Further, Acadia's current and potential investors consider a company's trustworthiness, stability, and ability to accurately describe its business operations. Acadia's ability to raise equity capital or debt on favorable terms in the future is now

impaired. In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company

128. Further, as a direct and proximate result of the Individual Defendants' actions, Acadia has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)  costs incurred from defending and paying any settlement or judgment in the Securities Class Action;

(b)  potential loss of government funding as a result of deplorable conditions at the Company's U.K. facilities;

(c)  excessive sums paid to repurchase Company stock;

(d)  costs incurred from any internal investigation; and

(e)  costs incurred from compensation and benefits paid to the defendants who have breached their duties to Acadia.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

129. Plaintiff brings this action derivatively in the right and for the benefit of Acadia to redress injuries suffered, and to be suffered, by Acadia as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Acadia is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

130. Plaintiff will adequately and fairly represent the interests of Acadia in enforcing and prosecuting its rights.

131. Plaintiff was a stockholder of Acadia at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Acadia stockholder.

132. The current Board of Acadia consists of the following nine individuals: defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud, and nondefendant Debra K. Osteen ("Osteen"). Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud Face a Substantial Likelihood of Liability for Their Misconduct**

133. As alleged above, Director Defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the 2017 and 2018 Proxy Statements. Defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud are responsible for the negligently made statements in the materially misleading Proxies. It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act. Accordingly, any indemnification provided by the Company to defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud does not protect them from violations of section 14(a) in the 2017 and 2018 Proxy Statements. As a result, defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud face a substantial likelihood of liability, excusing a demand.

134. Furthermore, as alleged above, defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud utterly failed to implement or cause Acadia to implement a reasonable, relevant, meaningful, and well-constituted system of internal controls designed to

ensure critical safety issues and violations of health and safety regulations reached the Board in a timely manner. Given the critical importance of providing adequate quality care to the Company's revenue stream, the Director Defendants had a duty to ensure the Company adequately addressed operational issues at its facilities. Rather than address the deficient internal controls, these defendants consciously disregarded their duty to act, doing nothing to implement the necessary internal controls. Accordingly, demand is excused as to defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud because they face a substantial likelihood of liability.

135.    In addition, defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding Acadia's operations, financial prospects, and disclosure controls and procedures. Defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud were responsible for reviewing and approving the Company's financial statements. These defendants authorized improper financial and public statements as well as failed to correct other improper statements the Officer Defendants made concerning Acadia's operations in the U.K. Defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud face a substantial likelihood of liability for causing or allowing the Company to engage in the unlawful conduct alleged herein. As a result, any demand upon defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud to bring suit against themselves or the Officer Defendants would be a useless and futile act.

136.    Defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud also face a substantial likelihood of liability for violating section 10(b) of the Exchange Act by

making the false and misleading statements that inflated the Company's stock price and then permitting or allowing the Company to repurchase its shares at these inflated prices.

137.    Defendants Bissell, and Grieco, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  In particular, according to the Audit Charter, the Audit Committee "represents and assists the Board in its general oversight of the Company's accounting and financial reporting processes."  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties making any demand upon them futile.

138.    Defendants Fincher, Gordon, Grieco, Jacobs, Turner, and Waud sold Acadia stock under highly suspicious circumstances.  These defendants as directors and/or officers of Acadia, possessed material, nonpublic company information and used that information to benefit themselves.  Defendants Fincher, Gordon, Grieco, Jacobs, Turner, and Waud sold stock based on this knowledge of material, nonpublic Acadia information regarding the Company's operating performance, growth prospects, adequacy of internal controls over its financial reporting, and the impending decrease in the value of their holdings of Acadia.  Accordingly, defendants Fincher, Gordon, Grieco, Jacobs, Turner, and Waud face a substantial likelihood of liability for breach of

their fiduciary duties of loyalty. Any demand upon defendants Fincher, Gordon, Grieco, Jacobs, Turner, and Waud is therefore futile.

139. Any suit by the current directors of Acadia to remedy these wrongs would expose defendants Duckworth, Turner, and Jacobs, and Acadia to liability for violations of the federal securities laws in the Securities Class Action, and would result in civil actions being filed against one or more of the other Individual Defendants. The Securities Class Action alleges violations of sections 10(b) and 20(a) of the Exchange Act. If the Board elects for the Company to press forward with its right of action against defendants Duckworth, Turner, and Jacobs in this action, then Acadia's efforts would compromise its defense of the Securities Class Action. Accordingly, demand on the Board is excused.

**Demand is Excused Because a Majority of the Board Cannot Conduct An Independent And Objective Investigation Into the Wrongful Conduct**

140. Many of Acadia's Board members have long-standing personal and professional ties to one another. The Board's tangled web of close professional and personal relationships, amount to conflicts of interest that have precluded, and will continue to preclude, it from taking necessary and proper steps to investigate and remedy Acadia's illegal conduct.

141. Defendant Jacobs has a number of links to other Board members through PSI, a company he founded. Defendant Jacobs co-founded PSI in April 1997 and served as Chairman of PSI's Board of Directors, President, and CEO from April 1997 until November 2010. From at least April 2003 until PSI was acquired by Universal Health Services, Inc. ("UHS"), defendants Turner and Fincher also served as executives of PSI. While defendants Jacobs, Turner and Fincher were executives and/or directors at PSI, defendant Petrie served as a PSI director from September 2004 to November 2010. Defendant Petrie also received substantial compensation from PSI in his capacity as Medical Director at one of the company's medical facilities. When

PSI was acquired by UHS, defendant Petrie received approximately $1.05 million from UHS for his interest in that company. Given defendants Jacobs, Turner, Fincher, and Petrie's long-standing professional ties, they will not vote to initiate litigation against one another, rendering pre-suit demand on them futile.

142. Defendants Jacobs, Turner, and Fincher also have long-standing ties to defendant Waud through Waud Capital Partners ("WCP"), a private equity firm focused on investing in the healthcare services and business technology services industries. Defendant Waud is the founder and managing partner of WCP. WCP co-founded Acadia in February 2005 along with the three initial members of its senior management team. According to a *Nashville Post* article, former PSI executives, including defendants Jacobs, Turner, and Fincher, collectively invested approximately $20 million in the Company and joined its management team in a "buy-in" transaction. Until May 2012, WCP was Acadia's controlling stockholder, owning more than 50% of the voting power of the Company's common stock. Based on defendants Jacobs', Turner's, Fincher's, and Waud's professional ties, they lack independence, rendering pre-suit demand on them futile.

143. In addition, demand is futile because the remaining Director Defendants will not vote to initiate litigation against defendants Waud, Jacobs, Turner, and Fincher. Every member of the Board is beholden to defendants Waud, Jacobs, Turner, and Fincher for their seats on the Board and the perquisites derived therefrom. Defendants Waud, Jacobs, Turner, and Fincher, who essentially co-founded and funded Acadia, have closely overseen the business operations of the Company since its establishment years ago and defendants Jacobs and Fincher have been significantly involved in the day-to-day business operations at Acadia. The entire Board is dependent in significant part on defendants Waud, Jacobs, Turner, and Fincher for their seats on

the Board, and would be expelled from their positions of power at Acadia, and the perquisites derived therefrom, for bringing the derivative claims against defendants Waud, Jacobs, Turner, or Fincher. Accordingly, the Board is disabled from fairly and objectively considering a pre-suit demand to bring, let alone vigorously prosecute, the derivative claims asserted against themselves and defendants Waud, Jacobs, Turner, and Fincher in this action.

144. Finally, defendant Gordon will not vote to initiate litigation against defendant Turner due to his close relationship with defendant Turner. Defendants Gordon and Turner concurrently served as directors at Surgery Partners, Inc., a company which operates surgical facilities, from June 2017 until August 2018. Based upon defendant Gordon's professional ties to defendant Turner, he lacks independence, rendering pre-suit demand on him futile.

**Demand is Excused as to NonDefendant Osteen Because She Lacks Independence**

145. The principal professional occupation of nondefendant Osteen is her employment with Acadia, pursuant to which she has received and continues to receive substantial monetary compensation and other benefits. Nondefendant Osteen is incapable of impartially considering a demand to commence and vigorously prosecute this action because she has an interest in maintaining her principal occupation and the substantial compensation she receives in connection with that occupation. Accordingly, nondefendant Osteen lacks independence from defendants Jacobs, Bissell, Gordon, Gregg, Grieco, Miquelon, Petrie, and Waud. This lack of independence renders nondefendant Osteen incapable of impartially considering a demand to commence and vigorously prosecute this action.

146. Plaintiff has not made any demand on stockholders of Acadia to institute this action because such a demand would be a futile and useless act for the following reasons:

(a)     Acadia is a publicly-traded company with hundreds, if not thousands of stockholders, with approximately 88.2 million shares outstanding as of November 6, 2018;

(b)     making a demand on such a number of stockholders would be impossible for plaintiff, who has no means of collecting the names, addresses, and/or phone numbers of Acadia stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expense and obstacles, assuming all stockholders could even by individually identified with any degree of reasonable certainty.

## COUNT I

**Against the Director Defendants for Violation of Section 14(a) of the Exchange Act**

147.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

148.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

149.    The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxy Statements.  In the Proxy Statements, the Board solicited stockholder votes to reelect themselves to the Board and reject the stockholder proposal to require the Company to prepare a sustainability report.

150.   The Proxy Statements, however, misrepresented and failed to disclose that: (i) the Company's U.K. operations did not provide the "competitive strength" driving supposed growth and profitability; (ii) the Company failed to maintain adequate disclosure controls and procedures with respect to Acadia's operations; (iii) the Board failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention; (iv) the Company had a history of non-compliance with rules and regulations concerning health and safety; and (v) Acadia faced significant reputational harm when the truth would inevitably unfold.  By reasons of the conduct alleged herein, the Director Defendants violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Acadia misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Acadia's recommendation to reelect certain Board members and reject the stockholder proposal to require the Company to prepare a sustainability report.

151.   The misleading information contained in the Proxy Statements was material to Acadia's stockholders in determining whether or not to elect these defendants and reject a stockholder proposal that would require the Company to prepare a sustainability report.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with the Proxy Statements was an essential link in the reelection of nominees to the Board and the decision not to adopt a provision requiring the Company to prepare a sustainability report.

152.   Plaintiff, on behalf of Acadia, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy Statements in connection with the improper

reelection of the members of the Board and vote against the stockholder proposal for the Company to adopt a policy requiring the Company prepare a sustainability report.

## COUNT II

**Against the Director Defendants for Violation of Section 10(b) of the Exchange Act**

153.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.    During the period of wrongdoing, the Director Defendants disseminated or approved false or misleading statements about Acadia, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

155.    At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by defendants, defendants caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to defendants' false or misleading statements.  Defendants engaged in a scheme to defraud Acadia by causing the Company to purchase $3.1 million in shares of Acadia stock at artificially inflated prices.

156.    Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Acadia in connection with the Company's  purchases of Acadia's stock during the period of wrongdoing.

157.    Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices and artifices to defraud in connection with the purchase and sale of Acadia stock, which were intended to, and did: (a) deceive Acadia and its stockholders regarding, among other things, the Company's operations and financial prospects; (b) artificially inflate and maintain the market price of Acadia stock; and (c) cause Acadia to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known.  Throughout the period of wrongdoing, defendants were in possession of material, nonpublic information regarding the above.

158.    Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the period of wrongdoing, as alleged above.

159.    As described above, defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.   The misstatements and omissions of material facts set forth in this complaint were either known to defendants or were so obvious that defendants should have been aware of them.  Throughout the period of wrongdoing, defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

160.     Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock, both by the Company itself and by the Insider Selling Defendants.

161.     As a result of defendants' misconduct, Acadia has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.

162.     Acadia would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by defendants' false or misleading statements.

163.     As a direct and proximate result of defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Acadia stock during the period of wrongdoing.  By reason of such conduct, defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

164.     Plaintiff brings this claim within two years of his discovery of the facts constituting the violation and within five years of the violation.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

165.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

166.     The Individual Defendants owed and owe Acadia fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Acadia the highest obligation of good faith, fair dealing, loyalty, and due care.

167. The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Acadia, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

168. The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration. The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company's U.K. operations did not provide the "competitive strength" driving supposed growth and profitability; (ii) the Company failed to maintain adequate disclosure controls and procedures with respect to Acadia's operations; (iii) the Company failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention; (iv) the Company's past and continuing non-compliance with rules and regulations concerning health and safety would subject the Company to regulatory scrutiny and jeopardize its government revenues; (v) the defendants' public statements about Acadia's business, operations, and financial prospects were misleading; and (vi) Acadia faced significant reputational harm when the truth would inevitably unfold. Accordingly, the Officer Defendants breached their duties of care and loyalty to the Company.

169. The Director Defendants, as directors of the Company, owed Acadia the highest duty of loyalty. These defendants breached their duty of loyalty by recklessly permitting the improper statements detailed herein. The Director Defendants knew or were reckless in not knowing that: (i) the Company's U.K. operations did not provide the "competitive strength"

driving supposed growth and profitability; (ii) the Company failed to maintain adequate disclosure controls and procedures with respect to Acadia's operations; (iii) the Company failed to implement a reasonable, meaningful, and well-constituted system of internal controls to ensure critical health and safety hazards and violations of regulations were timely brought to the Board's attention; (iv) the Company's past and continuing non-compliance with rules and regulations concerning health and safety would subject the Company to regulatory scrutiny and jeopardize its government revenues; (v) the defendants' public statements about Acadia's business, operations, and financial prospects were misleading; and (vi) Acadia faced significant reputational harm when the truth would inevitably unfold. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

170. The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

171. The Insider Selling Defendants breached their duty of loyalty by selling Acadia stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders. The information described above was proprietary, nonpublic information concerning the Company's future business prospects. It was a proprietary asset belonging to the Company, which defendants Fincher, Gordon, Grieco, Jacobs, Turner, and Waud used for their own benefit when they sold Acadia common stock.

172.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Acadia has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

173.    Plaintiff, on behalf of Acadia, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

174.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

175.    As a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Acadia is subject to the Securities Class Action.  The Individual Defendants have caused Acadia to waste its corporate assets by forcing the Company to expend valuable resources in defending itself in the ongoing litigation, in addition to any ensuing costs from a potential settlement or adverse judgment.

176.    In addition, the Individual Defendants have caused Acadia to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

177.    As a result of their waste of corporate assets, the Individual Defendants are liable to the Company.

178.    Plaintiff, on behalf of Acadia, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

179.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

180. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Acadia. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Acadia.

181. The Insider Selling Defendants sold $497.6 million worth of Acadia stock while in possession of material, adverse nonpublic information that artificially inflated the price of Acadia stock. As a result, the Insider Selling Defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

182. Plaintiff, as a stockholder and representative of Acadia, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

183. Plaintiff, on behalf of Acadia, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Acadia, demands judgment as follows:

A. Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B. Directing Acadia to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Acadia and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or

Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1. a proposal to strengthen the Company's controls over financial reporting and risk oversight;

2. a proposal to strengthen Acadia's oversight of its disclosure procedures;

3. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4. a provision to control insider selling;

5. a proposal to strengthen the Board's oversight with respect to stock repurchases; and

6. a provision to permit the stockholders of Acadia to nominate at least three candidates for election to the Board.

C. Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Acadia has an effective remedy;

D. Awarding to Acadia restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E. Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F. Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**


Dated: February 21, 2019

By: _Wade B. Cowan_ (signature)
           WADE B. COWAN (BPR# 9403)
           Of Counsel Davies, Humphreys & Reese PLC
           85 White Bridge Road, Suite 300
           Nashville, TN 37205
           Telephone: (615) 256-8125
           Facsimile: (615) 242-7853
           E-mail: wcowan@dhhrplc.com

           ROBBINS ARROYO LLP
           BRIAN J. ROBBINS
           STEPHEN J. ODDO
           ASHLEY R. RIFKIN
           5040 Shoreham Place
           San Diego, CA 92122
           Telephone: (619) 525-3990
           Facsimile: (619) 525-3991
           E-mail: brobbins@robbinsarroyo.com
                  soddo@robbinsarroyo.com
                  arifkin@robbinsarroyo.com

           Attorneys for Plaintiff

## VERIFICATION

I, Robert Davydov, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violations of Securities Laws, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:_____ 02 / 18 / 19 _____

_____

Robert Davydov